UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

UNITED STATES OF AMERICA,

v.

MIQUEL MORROW, *et al.*,

Defendants.

Criminal Action No. 04-355 (CKK)

**MEMORANDUM OPINION**
(February 1, 2006)

Currently before the Court are various post-trial Motions for a New Trial filed by

Defendants in this action pursuant to Federal Rule of Criminal Procedure 33, several oppositions

and responses to these motions submitted by the Government, and a variety of replies by Defendants.

Defendants move for a new trial on two grounds, contending that (1) the Government wrongfully

withheld impeachment material from the defense during the trial, in violation of the strictures

described in *Brady v. Maryland*, 373 U.S. 83, 83 S.Ct. 1194, 10 L.Ed.2d 215 (1963); and (2)

significant juror misconduct occurred when prejudicial, extraneous information was introduced into

the jurors' deliberations in this case.  Upon a searching examination of the myriad filings before the

Court, the testimony adduced at the evidentiary hearing regarding alleged juror misconduct held on

October 31, 2005, the relevant case law, and the entire record herein, the Court shall deny

Defendants' various Motions for a New Trial on both grounds.

**I: BACKGROUND**

*A.     The Relevant Charges*

On February 15, 2005, the Grand Jury in the above-captioned case returned a twenty count

Superseding Indictment against the six remaining defendants[1] in this case -- Miquel Morrow, Lionel

Stoddard, Carlos Aguiar, Bryan Burwell, Aaron Perkins, and Malvin Palmer (collectively,

"Defendants").[2]   Count I of the Indictment charged all six Defendants with a conspiracy to

participate in a Racketeer Influenced Corrupt Organization ("RICO"), in violation of 18 U.S.C. §

1962(d), based upon alleged racketeering acts involving armed robberies of four banks in the

District of Columbia (Acts 1-4) and two banks in the District of Maryland (Acts 5-6), as well as

three acts involving murder (Acts 7-9).   Count II charged all six Defendants with a conspiracy to

commit offenses against the United States, in violation of 18 U.S.C. § 371, by "unlawfully and

knowingly" combining, conspiring, confederating, and agreeing "to assault and put in jeopardy the

life of persons by the use of dangerous weapon[s] in the commission of the offense of bank robbery,

in that they would, while armed with firearms, by force and violence, against resistance and by

putting in fear, steal and take from persons and from the immediate actual possession of persons,

property of value, that is, money belonging to, and in the care, custody, control, management, and

possession of banks, the deposits of which were then insured by the Federal Deposit Insurance

Corporation, in violation of Title 18 United States Code, Sections 2113(a) and (d)."

---

[1] Messrs. Nourredine Chtaini, Omar Holmes, and Guidel Olivares were also associated with the Defendants as part of the relevant conspiracies, but cooperated with the Government and therefore were not defendants in this trial.

[2] Previous Indictments were handed down by the Grand Jury on August 5, 2004 and November 9, 2004.  Due to the motions schedule, which was aimed at surfacing the relevant issues and facts at the earliest possible point, a majority of the motions filed by the Government and the Defendants used the numbering scheme present in the November 9, 2004 Superseding Indictment when referring to specific counts.  However, for the purposes of complete accuracy, the Court will refer to the structure and scheme employed by the February 15, 2005 Superseding Indictment, as it was the controlling Indictment at trial.

Substantive charges involving armed bank robbery (Counts III, VII, X, XV) in violation of

18 U.S.C. §§ 2113(a), (d) and 18 U.S.C. § 2; using and carrying a firearm during a crime of

violence (Counts IV, VIII, XI, XVI) in violation of 18 U.S.C. §§ 924(c)(1)(A)(i)-(iii), (B)(i)-(ii),

and 18 U.S.C. § 2; unlawful possession of a firearm by a convicted felon (Counts V, VI, IX, XII-

XIV, XVII, XX) in violation of 18 U.S.C. § 922(g)(1); and assault with intent to kill (Counts XVIII,

XIX) were charged against the specific defendants named in those counts.[3]  The armed bank

robberies were allegedly accomplished while the Defendants brandished weapons and wore body

armor, hoods, masks, bandanas, and heavy clothing to avoid identification.  The assaults also

involved the use of firearms.

According to the Superseding Indictment, the purposes of the RICO conspiracy charged in

Count I

> included, among other things, the following: (i) committing robberies, including
> bank robberies, in the District of Columbia, the District of Maryland, and elsewhere
> for the purposes of obtaining money and other things of value; (ii) protecting
> members of the enterprise; (iii) maintaining in safe places the weapons, body armor,
> and money of the enterprise; and (iv) retaliating against persons who interfered with
> the operation of the enterprise, including the actual and perceived thefts of weapons
> by non-members of the enterprise.

Superseding Indictment (Count I) ¶ 7.  The objects of the Section 371 conspiracy charged in Count

II are similar:  "to obtain money and other things of value; to protect members of the conspiracy;

and to maintain in safe places the weapons, body armor, and money of the conspiracy."  *Id.* (Count

II) ¶ 3.  Each charged conspiracy is alleged to have operated "from on or about January 21, 2004 . .

---

[3] Count XX, a charge of unlawful possession of a firearm by a felon in violation of 18
U.S.C. § 922(g)(1) against Defendant Carlos Aguiar, was the only substantive offense that does not
arise directly out of one of the bank robberies alleged.  Rather, this count arose from the fact that
Defendant Aguiar possessed a firearm when he was stopped by police and arrested on August 4,
2004.

. up to and including on or about August 5, 2004, within the District of Columbia, the District of Maryland, and elsewhere." *Id.* (Count I) ¶ 8, (Count II) ¶ 2.  Numerous overt acts relating to each conspiracy are also alleged in each count.  All of the overt acts alleged and subsequent substantive counts (Counts III-XX) are said to have occurred within the January 21, 2004 – August 5, 2004 time-span.

On July 15, 2005, after a trial of over three months, the jury in this case returned with its verdict as to all Defendants.  Defendant Miquel Morrow was convicted of Counts I, II, III, IV, VII, VIII, X, XI, XII, XV, XVI, XVII, and XIX; however, Defendant Morrow was acquitted of Count XVII, which charged him with assault with intent to kill Edwin Arrington on or about April 23, 2004.  *See* Morrow Verdict Form at 1-9.  Defendant Lionel Stoddard was convicted of Counts I, II, X, XI, and XIV; however, like Defendant Morrow, Defendant Stoddard was also acquitted of Count XVII, which charged him with assault with intent to kill Edwin Arrington on or about April 23, 2004.  *See* Stoddard Verdict Form at 1-4.  Defendant Carlos Aguiar was convicted of all counts for which he was charged – Counts I, II, III, IV, V, X, XI, XIII, and XX.  *See* Aguiar Verdict Form at 1-6.  Defendant Bryan Burwell was also convicted of all counts for which he was charged – Counts I, II, X, and XI.  *See* Burwell Verdict Form at 1-3.  Likewise, Defendant Perkins was convicted of all counts for which he was charged – Counts I, II, XV, and XVI.  *See* Perkins Verdict Form at 1-3.  Finally, Defendant Malvin Palmer was also convicted of all counts for which he was charged – Counts I, II, III, IV, VI, VII, VIII, and IX.  *See* Palmer Verdict Form at 1-5.

B.    *Defendants' Motions for a New Trial*

Upon announcement of the verdicts on June 15, 2005, Defendants made various oral motions for a new trial, reaffirming their intentions in a July 19, 2005 teleconference held on the record with the Court.  *See United States v. Morrow*, Crim. No. 04-355 (D.D.C. July 19, 2005)

4

(Scheduling Order).  On August 15, 2005, Defendant Miquel Morrow filed a Motion for a New

Trial pursuant to Rule 33 of the Federal Rules of Criminal Procedure.  Defendant Morrow asserts

two grounds in support of his motion, including:  (1) an alleged violation by the Government of its

disclosure requirements, as set out in *Brady v. Maryland*, 373 U.S. 83, 83 S.Ct. 1194, 10 L.Ed.2d

215 (1963); and (2) alleged juror misconduct based on the introduction of extraneous information

into the jury's deliberations.  *See* Def. Morrow's Mot. for New Trial at 1-7.  Defendants Lionel

Stoddard (on August 16, 2005), Aaron Perkins (on August 16, 2005), and Carlos Aguiar (on

August 22, 2005) filed motions to join Defendant Morrow's motion, relying only on the second

basis – i.e., juror misconduct.[4]  Following the Government's First Response in Opposition to

Defendant Morrow's Motion, filed on August 16, 2005, and its Omnibus Opposition to the

Defendants' New Trial Motions, filed approximately one month later, Defendant Morrow filed both

a Supplemental Motion in Support of His Motion for a New Trial on September 14, 2005, and a

Reply to the Government's Omnibus Response on October 3, 2005; Defendant Aguiar filed a

Supplemental Motion in Support of His Motion for a New Trial on October 2, 2005; and Defendant

Palmer filed a Motion for Leave to Supplement Co-Defendant Morrow's Motion for a New Trial on

October 25, 2005, which the Government opposed in a October 26, 2005 filing.

     Upon an examination of the relevant motions, the Court became concerned about the relative

unspecific and generalized assertions of juror misconduct by Defendants, who had not attached any

---

[4] Defendants Malvin Palmer and Aaron Perkins, both on September 12, 2005, filed general motions to adopt their co-defendants' post-trial motions.  The Court granted each of these motions. Defendant Bryan Burwell has not filed a post-trial motion for a new trial, nor has he filed a motion to join his co-defendants.  However, pursuant to the Court's previous Order during the trial that allowed Defendants to implicitly adopt motions filed by one of their co-defendants, the Court shall consider any post-trial motion made by a defendant applicable to all Defendants – including Defendant Burwell.

affidavits by any jurors to their relevant motions.  Accordingly, the Court set an evidentiary hearing

regarding juror misconduct for October 31, 2005, and directed that – prior to the hearing –

Defendants provide the Government and the Court with (1) any "statement" made by any

juror-witness expected to appear at the October 31, 2005 hearing and (2) information identifying the

individual or individuals to whom the juror made such statements.  *See United States v. Morrow*,

Crim. No. 04-355 (D.D.C. Oct. 27, 2005) (Production Order).  Defendants complied with the

Court's Order, producing under seal certain post-trial e-mail communications with one juror – Juror

#1 – which they contended "describe 'extraneous prejudicial information.'"  *See* Def. Morrow's

Produc. of Stmts. to Court and Gov't at 1, ¶ 4; *see also* Def. Perkins' Resp. to the Court's Produc.

Order.

At the October 31, 2005 evidentiary hearing, Juror #1, the sole source of the statements

relied upon by Defendants, testified under oath and explained his previous statements regarding

potential juror misconduct.[5]  The Court, mindful of the parameters of Federal Rule of Evidence

---

[5] During this process, certain facts became evident:  (1) Juror #1 had affirmatively reached
out and contacted counsel for Defendant Morrow following the conclusion of the trial and the
announcement of the jury's verdict; (2) extensive e-mails were sent back and forth between Juror #1
and counsel for Defendant Morrow over the span of approximately two months, between August and
September 2005; and (3) on approximately two occasions, Juror #1 met with counsel for Defendants
Morrow and Aguiar over a light meal at a restaurant with each party paying their own bills.  A
review of the numerous e-mails sent by Juror #1, filed under seal in this case, *see United States v.
Morrow*, Crim. No. 04-355 (D.D.C. Oct. 31, 2005) (Minute Order sealing e-mails provided),
reveals that Juror #1 – a first-time juror – expounds at length upon his experience as a juror, peppers
his writings with a variety of opinion, conjecture, and speculation, and views the actions of his
fellow jurors through a particularly judgmental lens.  Given the length and depth of the contact
between certain defense counsel and Juror #1, Defendants certainly had an opportunity off-the-
record to discuss the case with a juror, investigate forthcoming information through further
questioning of that juror, and develop any evidence to support a motion for a new trial beyond the
limited record adduced at the October 31, 2005 evidentiary hearing.  Despite this opportunity,
Defendants have raised no theories or evidence other than the claims and information cited to in this
Memorandum Opinion.

The Court further notes for the record that it does <u>not</u> take issue with the conduct of defense

606(b), conducted the initial inquiry of Juror #1, and then gave each Defendant the opportunity to question the juror within the parameters provided by Rule 606(b) in order to flesh out his testimony. Three issues emerged at the hearing: (1) whether two separate jurors had visited crime scenes during jury deliberations; if so, (2) what prejudice to any Defendant may have resulted; and (3) whether a third juror had any improper communication with a dismissed juror. Following the October 31, 2005 evidentiary hearing, Defendants Morrow, Perkins, and Palmer filed supplemental memoranda in support of their Motions for a New Trial, and requested a further *voir dire* of all trial jurors. The Government, on December 7, 2005, filed an Omnibus Response to these new motions, to which Defendants filed a Reply, which requested that "the Court interview all jurors to determine actual prejudice to the defendants, or in the alternative, that the Court permit counsel to contact and interview all jurors." *See* Def. Perkins' Reply to Gov't's Omnibus Resp. at 2. Finally, rounding out the filings in this case, on January 24, 2006, Defendant Aaron Perkins filed another supplement to his motion for a new trial that addressed the voir dire of the two jurors who purportedly visited crime scenes. While the Court notes that this filing is untimely and deals with issues and charges that do not involve or prejudice Defendant Perkins in any way, given the fact that the Court has allowed Defendants to adopt the motions filed by their co-defendants, the Court shall consider Defendant Perkins' January 24, 2006 Supplement. On January 25, 2006, the Government filed a Reply to Defendant Perkins' Supplement, completing the briefing in this case.

C.    *Testimony Adduced at the October 31, 2005 Evidentiary Hearing*

Four central issues have emerged as a result of Juror #1's testimony at the October 31, 2005

---

counsel with regard to their contact with Juror #1. Based on the present record, there is no evidence to suggest that defense counsel acted improperly in their dealings with Juror #1 during the events leading up to the October 31, 2005 evidentiary hearing.

evidentiary hearing.  Defendants contend that these identified issues, taken either separately or

collectively, are either sufficient to warrant new trials under the prevailing standards of review or are

significant enough to require further investigation of all jurors by the Court.

     1.    The Industrial Bank Robbery

First, Juror #1 recalled a statement by Juror #12 during deliberations regarding the

Industrial Bank robbery that gave him pause.  *See* 10/31/05 Hrg. Tr. at 36:2-21.  It is undisputed

that an armed robbery of the Industrial Bank, which is located at 2012 Rhode Island Avenue, N.E.,

Washington, D.C., occurred on or about June 12, 2004.  This armed robbery was "Racketeering Act

No. 3" under Count I of the Superseding Indictment, which charged all Defendants with a RICO

Conspiracy in violation of 18 U.S.C. § 1962(d), and formed the basis for Count X (armed robbery

of Industrial Bank on or about June 12, 2004) charged against Defendants Morrow, Stoddard,

Aguiar, and Burwell; Count XI (using and carrying a firearm during and in relation to a crime of

violence on or about June 12, 2004) charged against Defendants Morrow, Stoddard, Aguiar, and

Burwell; Count XII (unlawful possession of a firearm on or about June 12, 2004, by a person

convicted of a crime punishable by imprisonment for a term exceeding one year) charged against

Defendant Morrow; Count XIII (unlawful possession of a firearm on or about June 12, 2004, by a

person convicted of a crime punishable by imprisonment for a term exceeding one year) charged

against Defendant Aguiar; and Count XIV (unlawful possession of a firearm on or about June 12,

2004, by a person convicted of a crime punishable by imprisonment for a term exceeding one year)

charged against Defendant Stoddard.  As noted previously, each of these Defendants was convicted

of every charge relating to the robbery of the Industrial Bank.

Specifically, Juror #1 recalled that, during deliberations,

somehow, the – the teller area came up; you know, the area behind the booth, the teller booth.  And to my recollection, she [Juror #12] said, "Oh, it's very small back there."

And somebody said – I don't know who – but somebody said, "Well, how do you know?"

And she said, "Oh, I've been there."

Somebody said, "Did you go there?"

And she goes, "Well, I've been there."

So I don't know when she was there exactly, but the way she said it kind of indicated to me that she knew the bank.  And it didn't bother me.  I mean, I didn't care what, you know, the teller area looked like.

10/31/05 Hrg. Tr. at 36:10-21.  According to Juror #1, Juror #12 gave no further indication when or how she had seen the teller's area in the Industrial Bank.  *Id.* at 39:6-11.  Once Juror #12 concluded by saying something to the effect of "'Well, yes, I've been to that bank,'" the other jurors "just dropped" the topic and sought no further information.  *Id.* at 53:15-54:2.  Juror #1 volunteered that he did not take this information into account when rendering his verdict as to the relevant Defendants.  *Id.* at 38:17-21.  Indeed, Juror #1 noted that this information was essentially irrelevant to what the jury was considering.  *Id.* at 100:15-20 ("I didn't see how relevant it was.").

2.     The April 23, 2004 Assault With Intent to Kill Edwin Arrington

Second, Juror #1 testified at the October 31, 2005 evidentiary hearing that extraneous information might have been introduced into the jury's deliberations regarding the April 23, 2004 assault with intent to kill ("AWIK") Edwin Arrington.  Defendants Miquel Morrow and Lionel Stoddard were charged with an AWIK substantive offense arising out of this alleged assault of Mr. Arrington, *see* Count XVIII, and this offense also formed "Racketeering Act No. 7" of the Count I

RICO Conspiracy charge against these two Defendants.[6]  At trial, witness Antwon Perry provided

the most significant testimony regarding this alleged assault, which apparently occurred in an area

near 9th Street, Kennedy Street, and Longfellow Street.  Ultimately, the jury acquitted Defendants

Morrow and Stoddard of Count XVIII, the substantive AWIK charge, *see* Morrow Verdict Form at

9; Stoddard Verdict Form at 4, but found that the charge had been "proven" as a "racketeering act"

under Count I, *see* Morrow Verdict Form at 3; Stoddard Verdict Form at 2.[7]  The jury also

concluded that the Government had "proven" seven other "racketeering acts" against Defendant

Morrow as part of the RICO Conspiracy charge, *see* Morrow Verdict Form at 1-3, and that the

Government also had "proven" three other "racketeering acts" against Defendant Stoddard as part of

the Count I charge, *see* Stoddard Verdict Form at 1-2.

Specifically, Juror #1 recalled at the October 31, 2005 evidentiary hearing that during

deliberations regarding this particular AWIK charge, when the jurors were debating "if you could

see [what Mr. Perry had testified to] from the liquor store, the street, down the alleyway," 10/31/05

Hrg. Tr. at 37:4-6, Juror #5 said:

> "You can see from there."  She said, "I've seen – I could see" – that's what she said.
> She said –
>
> And somebody said, "Why?  How do you know?"
>
> And she said, "Well, I've been there."

---

[6] Defendants Morrow and Stoddard were the only Defendants charged with this AWIK
offense and racketeering act; no other Defendants were involved in or charged with the April 23,
2004 assault, meaning that any testimony and deliberations regarding that offense had direct
relevance only to Defendants Morrow and Stoddard.

[7] Upon a reading of this verdict, it is apparent that the jury concluded that Defendants
Morrow and Stoddard did not commit the actual attack on Mr. Arrington on April 23, 2004, but
found that they were involved in a larger conspiracy to assault Mr. Arrington in order to preserve the
spoils of their RICO enterprise.

And of course, somebody – they said, "You have?"

And she said, "Yes.  You know, I drive by there all the time," or, you know, "I go by there."

But the fact that she said it was like, sort of like, we were all – we were almost in agreement that you couldn't see through the photographs.

*Id*. at 37:11-21.  According to Juror #1, Juror #5 offered no explanation other than "she goes by there all the time," *id*. at 39:12-16, and gave no indication as to when exactly she would have been driving by the location of the alleged AWIK, *id*. at 38:5-10.  Moreover, after telling her fellow jurors that "'You can see – you can see the alleyway from the end of the street'" and that she had "'been there,'" the discussion "was dropped" by the other jurors.  *Id*. at 54:4-16.  Once again, Juror #1 volunteered that he did not consider this information when rendering his verdict as to Defendants Morrow and Stoddard.  *Id*. at 38:11-16.

### 3. The June 30, 2004 Washington Post News Article

On June 29, 2004, an armed robbery of the SunTrust Bank located at 5000 Connecticut Avenue, N.W., Washington D.C., occurred.  Arising out of this robbery was "Racketeering Act No. 4" of Count I, charged against Defendants Morrow and Perkins; Counts XV (armed robbery) charged against Defendants Morrow and Perkins; Count XVI (using and carrying a firearm during and in relation to a crime of violence on or about June 29, 2004) charged against Defendants Morrow and Perkins; and Count XVII (unlawful possession of a firearm on or about June 29, 2004, by a person convicted of a crime punishable by imprisonment for a term exceeding one year) charged against Defendant Morrow.  On July 15, 2005, the jury convicted Defendants Morrow and Perkins of each of these charges.  *See* Morrow Verdict Form at 2, 7-9; Perkins Verdict Form at 1-3.

On the day after this robbery, June 30, 2004, the Washington Post published an article entitled "Gang Stages Sixth Bank Holdup; Men With Rifles Fire Shots in Connecticut Ave. Branch,

Take $50,000." *See* Gov't's Omnibus Opp'n, Ex. 1 (Lexis printout of the June 30, 2004

Washington Post article).  The original article was offered and accepted into evidence because (1) it

contained a photograph of masked and armed individuals exiting the SunTrust Bank with their

robbery proceeds, and (2) it was discovered by police underneath Defendant Perkins' bed at his

residence, thereby providing circumstantial evidence of his involvement.  A review of the article

indicates that it was published prior to the first arrest regarding the bank robberies – the arrest of

Nourredine Chtaini, which occurred on July 11, 2004 – and it contains virtually no description or

identification of any of the "gunmen" besides the fact that they were "masked," "vicious," and

"brazen."  *Id*. at 1-2; *see also* Gov't's Ex. Brinkley #27 (original, admitted June 30, 2004

Washington Post article).

> At the October 31, 2005 evidentiary hearing, Juror #1 noted that
>
> I just thought it was unusual that a part of the evidence was that [sic] the Washington
> Post newspaper that was delivered as evidence and, you know, it had the photograph
> of the bank, the SunTrust, and one of the suspects.  You know, and we ended up
> reading the article, and – which I thought was strange.  I thought maybe we should
> only have a photograph of it or – you know, but it was a big article.

10/31/05 Hrg. Tr. at 30:2-9.  No other testimony regarding the June 30, 2004 Washington Post

article was adduced at the October 31, 2005 evidentiary hearing.

### 4.   Juror Contact With a Dismissed Juror

The fourth and final major issue raised at the October 31, 2005 hearing concerned potential

contact by certain jurors with Juror #4, an individual who worked as a chef and had previously been

a member of the jury until his dismissal by the Court during the trial several weeks prior to the

commencement of deliberations.  Juror #1 testified that both Juror #2 and Juror #15 had indicated,

during the deliberations period in this case, that they remained in contact with dismissed Juror #4.

*Id*. at 39:17-40:2.  According to Juror #1, "during the last week of deliberations," *id*. at 40:23-25,

Juror #2 notified him that some of the jurors were planning "an after-verdict picnic" for August 6, 2005, asked him if he would like to attend, and informed him that "Chef," i.e., dismissed Juror #4, "would be fixing the food," *id.* at 40:5-13.  Juror #2 said nothing else about Juror #4's role in the picnic or any conversations that she had with him other than the fact that "he was going to cook, which supposedly he's a good cook." *Id.* at 71:16-19, 72:11-16, 73:17-24.  Juror #1 did not hear Juror #2 discussing the planned picnic with any other jurors. *Id.* at 70:24-71:1.  However, Juror #1 noted that Juror #2 appeared to have a working list of jurors, with their names and phone numbers, for future contact regarding the post-verdict picnic. *Id.* at 41:1-8.

Juror #1 also assumed that Juror #15 still had some contact during this period with dismissed Juror #4 for two reasons.  First, Juror #2 apparently mentioned to him that Juror #15 also was going to be at the planned August 6, 2005 post-verdict picnic. *Id.* at 40:19-25.  Second, after one member of the jury said something to the effect of "'Aren't you glad that juror number 4 is off [has been dismissed]?  He's not sleeping,'" *id.* at 40:14-17, Juror #15 responded by saying, "'Don't talk bad about my friend, Chef,'" *id.* at 40:18. *See also id.* at 67:13-22, 75:23-76:7.  According to Juror #1, he had no knowledge of any contact beyond these statements, and Jurors #2 and #15 never made any statements within his presence indicating that they had discussed the case with dismissed Juror #4. *Id.* at 41:23-42:2.

5.    Other Generalized Issues

During the October 31, 2005 evidentiary hearing, Juror #1 briefly mentioned two other facts that gave him pause during the trial.  First, according to Juror #1,

> it seemed like most of the jurors were familiar with the area, the different areas, the different banks, the different streets.  And I had never seen those areas before.
>
> So, it just seemed like they were familiar with the neighborhood and the banks.  Like a lot of people knew the Industrial Bank, you know.  And some people knew

13

Kennedy Street and some people knew Sherman Avenue, and I had never been to any of those places before, so —

In fact, I even said, you know – you know, I said, "Well, you know, this is – you know, I don't live in that kind of neighborhood.  I don't have people running down the street shooting people."

*Id.* at 42:13-24; *see also id.* at 52:2-14.  However, Juror #1 never expanded on this comment, despite the opportunity, and only identified the instances involving the Industrial Bank teller area and the April 23, 2004 AWIK where he believed that certain jurors appeared to have visited the scene of the crime.  *Id.* at 38:22-25, 105:17-24.

Second, Juror #1 mentioned that on the last day of deliberations, the U.S. Marshal overseeing the jurors indicated that books, newspapers, and radios should not be in the jury room during deliberations such that the jury's consideration of the issues would not be needlessly delayed. *Id.* at 50:11-23.  According to Juror #1, "the marshal warned us not to bring those things, and that the Judge was upset because the night before we had come in to say goodnight, that you were very unhappy with, you know, people carrying books and earphones and magazines."  *Id.* at 50:24-51:7. Juror #1 noted that the marshal informed the jurors that "'This is not some kind of party back here . . . . You're supposed to be deliberating.'"  *Id.* at 89:14-90:17.

## II: DISCUSSION

Rule 33 of the Federal Rules of Criminal Procedure provides, in relevant part, that:  "Upon the defendant's motion, the court may vacate any judgment and grant a new trial if the interest of justice so requires."  Fed. R. Crim. P. 33(a).  The granting or denial of a motion for a new trial is committed to the sound discretion of the trial court judge, and is reviewed only for abuse of discretion.  *United States v. Kelly*, 790 F.2d 130, 133 (D.C. Cir. 1986); *United States v. Mangieri*, 694 F.2d 1270, 1285 (D.C. Cir. 1982).  According to Defendants, a new trial in this case is

14

warranted under these standards due to (1) "[t]he withholding of vital impeachment evidence by the prosecution and the untimely disclosure of said evidence during the trial," Def. Morrow's Mot. for New Trial at 1, and (2) "improper consideration of extraneous information during deliberations" by members of the jury, *id*. The Court shall review each allegation in turn, and shall take into account the evidence adduced at the October 31, 2005 evidentiary hearing when considering the issue of juror misconduct through the use of "extraneous information."

A.      *Asserted Brady Violation*

Under the standard articulated in *Brady v. Maryland*, the government is required to disclose all evidence in its possession that is favorable to a defendant and "material either to guilt or to punishment." *Brady*, 373 U.S. at 87, 83 S.Ct. 1194. As an initial matter, it is important to set out four basic propositions of *Brady* jurisprudence. First, "favorable evidence" for the purposes of *Brady* encompasses both evidence that is exculpatory and evidence that could be used to impeach a government witness. *United States v. Bagley*, 473 U.S. 667, 676-77, 105 S.Ct. 3375, 87 L.Ed.2d 481 (1985); *see also United States v. Smith*, 77 F.3d 511, 515 (D.C. Cir. 1996). Second, the materiality of evidence depends on its importance to the case: "The evidence is material only if there is a reasonable probability that, had the evidence been disclosed to the defense, the result of the proceeding would have been different. A 'reasonable probability' is a probability sufficient to undermine confidence in the outcome." *Bagley*, 473 U.S. at 682, 105 S.Ct. 3375; *see also Smith*, 77 F.3d at 515 (evidence is material if "the undisclosed information could have substantially affected the efforts of defense counsel to impeach the witness, thereby calling into question the fairness of the ultimate verdict"). Third, regardless of whether or not the information is requested specifically by the defense, suppression by the government of favorable material evidence is constitutional error "if there is a reasonable probability that, had the evidence been disclosed to the

defense, the result of the proceeding would have been different." *Kyles v. Whitley*, 514 U.S. 419,

430-32, 115 S.Ct. 1555, 131 L.Ed.2d 490 (1995) (quoting *Bagley*, 473 U.S. at 682, 105 S.Ct.

3375). "The government has an ongoing burden to provide material exculpatory evidence whenever

it discovers that it has such information in its possession," *United States v. Blackley*, 986 F. Supp.

600, 601 (D.D.C. 1997), and the due process concerns that underpin this requirement are present

"irrespective of the good faith or bad faith of the prosecution," *Brady*, 373 U.S. at 87, 83 S.Ct.

1194. The government must bear in mind that it has the "affirmative duty to resolve doubtful

questions in favor of disclosure" and that "if the sword of Damocles is hanging over the head of one

of the two parties, it is hanging over the head of [the government]." *Blackley*, 986 F. Supp. at 607.

Fourth, and finally, the existence of a duty to disclose witness statements at trial pursuant to the

Jencks Act, 18 U.S.C. § 3500, does not eviscerate the government's *Brady* obligation to disclose

witness statements well in advance of trial if those statements also fall under *Brady*. *See United

States v. Tarantino*, 846 F.2d 1384, 1414 n.11 (D.C. Cir. 1988), *cert. denied*, 488 U.S. 867, 109

S.Ct. 174, 102 L.Ed.2d 143 (1988). Importantly, the government is still required to disclose *Brady*

material in sufficient time for the defendant to "use the favorable material effectively in the

preparation and presentation of [his or her] case, even if satisfaction of this criterion requires pre-

trial disclosure," *United States v. Pollack*, 534 F.2d 964, 973 (D.C. Cir. 1976), *cert. denied*, 429

U.S. 924, 97 S.Ct. 324, 50 L.Ed.2d 292 (1976), while Jencks material is not required to be

disclosed until after the witness has testified.

     1.    <u>Background</u>

     Initially, Defendant Morrow claimed in his first post-trial motion that the Government failed

to disclose Jencks Act material involving prosecution witness Antwon Perry (specifically, his grand

jury testimony), some of which was contradictory to key Government witness Nourredine Chtaini's testimony, until after the completion of Chtaini's testimony. *See* Def. Morrow's Mot. for New Trial at 2-3 ("The prosecution did not disclose this highly contradictory testimony until after Chtaini had testified and been excused."). Specifically, Defendant Morrow cited apparent discrepancies between Mr. Perry's grand jury testimony and Mr. Chtaini's trial testimony regarding (1) which individuals lived at the Taylor Street residence, and how often Defendant Morrow visited the residence; and (2) the specific details of the uncharged, thwarted robbery of an armored car that members of the RICO enterprise had planned on January 21, 2004. *Id.*

To provide some background: At trial, Mr. Chtaini had testified that he and Antwon Perry along with certain members of the later RICO enterprise (including Defendants Morrow, Aguiar, and Palmer), *see* 5/3/05 Tr. at 3187-88, had planned to rob an armored car at a Citibank on Wisconsin Avenue in Washington, D.C., on January 21, 2004. However, according to Mr. Chtaini, this planned robbery fell through, despite the fact that these five individuals waited in a parked van near the bank for several hours, because the anticipated armored car never appeared. *See* 5/3/05 Tr. at 3213-14. The Government did not charge any of the alleged participants with this attempt; rather, through Mr. Chtaini, they presented this evidence at trial only to show that members of the charged conspiracy knew each other and criminally associated with each other prior to the first successful bank robbery on January 22, 2004 (the Bank of America armed robbery). Despite the fact that he was present at the unsuccessful, uncharged January 21, 2004 attempt, the Government did not question Mr. Perry regarding this event in its case-in-chief; however, on or about June 14, 2004, Defendant Aguiar called Mr. Perry as part of the defense case to testify regarding the attempted robbery. In contrast to Mr. Chtaini, who had placed Defendant Aguiar in the van outside the bank awaiting the armored car and who had testified that Mr. Perry had obtained the van for the

group, *see* 5/3/05 Tr. at 3190:15-18, 3211:5-14, Mr. Perry testified at trial that – although his

recollection was hazy due to his use of marijuana on that day, 6/14/05 Tr. at 7069:7-16 – (1) the

group used a white Lexus SUV that day, not a van, *id.* at 7066:2-4; (2) he was not the individual

who stole the automobile for the group, *id.* at 7066:8-10; and (3) while Mr. Aguiar did not go with

the group to the bank that day, *id.* at 7064:25-7065:2, Mr. Aguiar was present when the group

planned the attempted robbery, put on their bulletproof vests, and gathered their weapons, *id.* at

7068:1-7069:1.  According to Mr. Perry's trial testimony, Mr. Aguiar remained in the Taylor Street

residence on January 21, 2004 to protect the group's stockpile of weapons.  *Id.* at 7069:2-6.

Defendant Morrow first post-trial motion asserted that Mr. Perry's grand jury testimony had

these "materially different details" from Mr. Chtaini's trial testimony regarding the unsuccessful

January 21, 2004 planned holdup of an armored car:  (1) Mr. Perry recalled that the group left from

the Taylor Street residence, not the residence on 7th Street and Longfellow that Mr. Chtaini

identified; (2) Mr. Perry did not mention Defendant Morrow's purported stop at the Morrow

family's residence that Mr. Chtaini described; (3) Mr. Perry remembered that the group used a white

Lexis SUV frequently used by Mr. Chtaini that day, not a van; (4) Mr. Perry believed that

Defendant Aguiar stayed at home, and did not travel with the group to the scene; (5) Mr. Perry

testified that Mr. Chtaini gave him the keys so that he could drive that day, while Mr. Chtaini's trial

testimony was silent on which individual drove that day; (6) while Mr. Chtaini recalled that the

group had entered an Armand's Pizza and purchased pizza while waiting for the armored car, Mr.

Perry testified that the group ordered pizza from a cell phone and it was delivered to a nearby house;

(7) Mr. Perry did not mention that – after giving up on the planned robbery – the group followed a

UPS truck and took certain boxes after they were delivered, a detail that Mr. Chtaini recalled at

trial; and (8) Mr. Perry mentioned that after the failed attempted, the group returned to the Taylor

18

Street residence, and Defendant Morrow went to visit his children at another location for a time,

while Mr. Chtaini remembered that the group – without Mr. Perry (meaning Mr. Chtaini and

Defendants Morrow, Aguiar, and Palmer) – went to Defendant Palmer's residence at 1914 Rochelle

Drive instead and slept there for the night.  *Compare* 11/15/04 Perry Grand Jury Test. at 18-27 *with*

5/3/05 Tr. at 3186:4-3215:21 (Chtaini trial testimony).  As such, Mr. Perry and Mr. Chtaini

disagreed on six different details, while Mr. Chtaini recalled two details that Mr. Perry did not

mention in his grand jury testimony.

Upon receipt of Defendant Morrow's first post-trial motion making these allegations

regarding untimely disclosure, the Government immediately filed its First Response in Opposition to

Defendant Morrow's Motion for a New Trial.  In its First Response, the Government explained that

"[t]he *Jencks* materials for all three cooperating witnesses, Nourredine Chtaini, Omar Holmes, and

Antwon Perry, were provided to the defendant on Friday, April 22, 2005.  This transfer of materials

was memorialized in a letter dated April 25, 2005, which included a very specific inventory."

Gov't's First Resp. at 2, ¶ 3; *see also* 4/25/05 Tr. at 2198:17-22 (Gov't Attn'y Ms. Kittay

represents that on April 22, 2005, the Government provided all *Jencks* material to Defendants);

Gov't First Resp., Ex. A (April 25, 2005 Letter from Gov't memorializing transmission of Jencks

material).  Importantly, in its memorialized inventory of the materials handed over on Friday, April

22, 2005, items #3 through #11 are: a 9/15/04 FBI 302 of Antwon Perry with notes; a 10/5/04 FBI

302 of Mr. Perry with notes and photographs; a 3/4/05 FBI 302 of Mr. Perry with notes and

receipts; Mr. Perry's 11/15/04 plea agreement and proffer; the grand jury testimony of Antwon

Perry from 11/15/04; Mr. Perry's PDID photo; Mr. Perry's Wales record; Mr. Perry's juvenile

record from the District of Columbia; and Mr. Perry's juvenile record from Arlington, Virginia.  *See*

Gov't First Resp., Ex. A (April 25, 2005 Letter from Gov't memorializing transmission of Jencks

material and accompanying index listing inventory) (emphasis added).  In its First Response, the

Government further noted that Defendants had ample time to review and use this material provided

on April 22, 2005, given the fact that "Mr. Chtaini did not commence his testimony until May 3,

2005, and defendant Morrow's counsel did not commence her cross-examination of him until May

10, 2005, *eighteen days* after the materials were provided, a time period that included three

weekends." *Id.* at 3 ¶ 5.

When faced with this evidence, Defendant Morrow shifted his *Brady*/Jencks argument after

admitting that "[t]he defendant cannot dispute the Government's assertion that the prior statements

of witness Antwon Perry were turned over to him as Jencks material on April 22, 2005."  Def.

Morrow's Suppl. Mem. at 1.  However, Defendant Morrow continues to insist that "this turnover

was untimely and did not satisfy the Government's obligations under *Brady v. Maryland*" and

emphasizes the rule that "[d]isclosure by the government must be made at such a time as to allow

the defense to use the favorable material effectively in the preparation and presentation of its case."

*Id.*  Defendant Morrow now contends that the Government failed in its duties because "the

Government's turn over of Jencks material at the particular time was predestined to go undetected

by the defendants until after the conclusion of Mr. Chtaini's testimony."  *Id.*  According to

Defendant Morrow, "[t]he giving over of exculpatory or impeaching documents buried under

hundreds of pages of other documents in the middle of the trial is tantamount to suppression."  *Id.*

2.    Application

While admitting that the Government did turn over Mr. Perry's materials well in advance of

Mr. Chtaini's testimony and cross-examination, Defendant Morrow claims that the Government

violated the strictures of *Brady* because "the information was not provided in a manner allowing

[the] defendant[s] to use it 'effectively in the preparation and presentation of [their] case[s.]'" Def.

Morrow's Reply at 5 (quoting *Pollack*, 534 F.2d at 973).  In support of his proposition, Defendant

Morrow relies almost completely on a decision by another jurisdiction, the Second Circuit's ruling

in *United States v. Gil*, 297 F.3d 93 (2d Cir. 2002).  *See* Def. Morrow's Reply at 3-5.  In *Gil*, the

Second Circuit concluded that a violation of *Brady* had occurred when less than one business day

before start of trial, the government delivered to the defense 2,700 pages of poorly indexed Jencks

Act material, which included over 600 exhibits worth of information.  *See Gil*, 297 F.3d at 106.

Emphasizing a particularly important memo hidden in the wealth of materials provided, the *Gil*

court found that the disclosure – "delivered sometime on the Friday before a Monday trial, at a time

presumably when a conscientious defense lawyer would be preoccupied working on an opening

statement and witness cross-examinations" – was tantamount to suppression.  *Id*.  The Second

Circuit found that a new trial was required, given that (1) the memo in question was favorable to the

defendant; (2) the memo was material to his defense; and (3) "[t]here is a reasonable probability that

the disclosure of the memo would have resulted in a different outcome at trial, and the non-

disclosure seriously undermines the confidence in the verdict of guilty."  *Id*. at 105.

Upon a review, the Court concludes that Defendant Morrow's argument is without merit.

Taking the Second Circuit's decision in *Gil* into account along with Defendant Morrow's related

arguments, six important distinctions must be made.

_____(1)  Timing:  The Government in this case turned over the material in question eighteen days

before the defense would have been able to actively use the information in its cross-examination of

Mr. Chtaini and eleven days before Mr. Chtaini actually took the stand.  In contrast, the defendant in

*Gil* was forced to contend with a situation where a wealth of information was disclosed less than one

business day before his short trial.  As such, when compared to the defendant in *Gil*, Defendants here

had significantly more time – weeks, in fact – to locate Mr. Perry's grand jury testimony within the material provided, review the testimony, and use the testimony in an effort to impeach Mr. Chtaini.

(2)  Resources:  Unlike the defendant in *Gil*, who was the sole defendant in that case, this case contained six co-defendants with largely overlapping defenses, especially with respect to the planned impeachment of Mr. Chtaini.  In practice, this meant that six different lawyers could review the material provided by the Government on April 22, 2005 over eighteen days – including over three separate weekends – and could divide the review six-ways based on either amount or subject-matter. Indeed, this trial was highlighted in many ways by a salutary and in some respects an astounding amount of cooperation between the six defense attorneys, who enjoyed apparently good relations.  Accordingly, in comparison to the defendant in *Gil*, Defendants in this case had a plethora of time and resources to tackle the information provided, making it less likely that the Government somehow "suppressed" Mr. Perry's grand jury testimony and more likely that (1) for unknown reasons, Defendants did not review or consider the material; or (2) Defendants did review the material but did not discern the possible usefulness of Mr. Perry's grand jury testimony at the time; or (3) Defendants actually learned of the contradictions but determined that the differences between Mr. Chtaini and Mr. Perry regarding an unsuccessful, uncharged act where not worth dwelling upon when compared to the numerous crimes actually charged.

(3)  Indexing/Amount of Materials: Unlike the defendant in *Gil*, Defendants here have not raised an argument that the Jencks material provided by the Government was improperly indexed. *See* Def. Morrow's Reply at 1-5.  Rather than providing the Jencks Act material in a formless mass or without a proper index, it is evident that the Government here created a detailed "inventory" of the specific documents, photographs, and transcripts provided to the defense on April 22, 2005.  *See* Gov't First Resp., Ex. A (April 25, 2005 Letter from Gov't memorializing transmission of Jencks

22

material and accompanying index listing inventory).  Moreover, while the Court has not been

provided information about the volume of pages turned over by the Government on April 22, 2005,

a review of the attached inventory indicates that only roughly 67 different items[8] were contained

within the production – a far cry from the 600 exhibits worth of material in question in *Gil*.  *See*

Gov't First Resp., Ex. A (April 25, 2005 Letter from Gov't memorializing transmission of Jencks

material and listing inventory).  As such, when compared to *Gil*, Defendants were given a correct

index and had significantly less material to review.

(4) <u>How Noticeable Was the Material?</u>: As noted earlier, in contrast to *Gil*, the Government

here provided Defendants with an accurate and easily digestible index to aid Defendants' review of

the materials provided on April 22, 2004 – which included Antwon Perry's testimony.  When

Defendants were given this material, all participants in the trial where well aware (1) Mr. Chtaini

was an imminent witness for the Government, and (2) Mr. Chtaini was a key witness for the

Government, if not the crux of its case.[9]  Given that such an important witness was looming,

Defendants should have known that any differences between Mr. Chtaini's testimony and his fellow

cooperating witnesses could be important for impeachment purposes.  Even if they had not known of

Mr. Perry's existence or cooperation in advance, the Government's inventory – listing "Plea

agreement dtd 11-15-04 with proffer" under materials related to Mr. Perry – would have clued

Defendants into the fact that Mr. Perry was a cooperating witness, and that it might be important to

review "Grand Jury testimony of Antwon Perry (11-04-04)" before cross-examining Mr. Chtaini.

---

[8] Counting, for instance, "grand jury testimony of Wayne Coleman" as one, "grand jury testimony of Bonita Cobb" as two, and so forth.  *See* Gov't First Resp., Ex. A (April 25, 2005 Letter from Gov't memorializing transmission of Jencks material and listing inventory).

[9] Knowledge of Mr. Chtaini and his importance is plainly evident in Defendants' multitude of pre-trial motions.

23

*See* Gov't First Resp., Ex. A (April 25, 2005 Letter from Gov't memorializing transmission of Jencks material and accompanying index listing inventory).  Moreover, unlike the memo focused on by the Court in *Gil*, which was listed "on page twelve of a 41-page index designating over 600 exhibits," *Gil*, 297 F.3d at 106, the items relating to Mr. Perry, including his plea agreement and grand jury testimony, were listed on the first page of the Government's "inventory" – items #3 through #11.  As such, while the defendant in *Gil* had a difficult time locating the material or realizing its importance on first glance, Defendants here could have easily located the material in question and should have known of its potential importance on its face.[10]

(5) Use of Evidence During Trial:  The memorandum focused on by the *Gil* court was not discovered by the defense "until after the trial was over"; accordingly, its contents were not considered by the jury.  *Gil*, 297 F.3d at 97.  In this case, Mr. Perry's grand jury statements regarding (1) which individuals lived at the Taylor Street residence, and how often Defendant Morrow visited the residence and (2) the specific details of the uncharged, thwarted planned robbery of an armored car on January 21, 2004 apparently were not used by the defense to directly "impeach" Mr. Chtaini during his testimony.  However, Mr. Perry's grand jury testimony was obviously used by the defense prior to the end of trial.  When recalled by Defendant Aguiar on June 14, 2005 and asked for the first time in this trial about the failed January 21, 2004 armored car robbery, Mr. Perry testified at trial that – in contrast to Mr. Chtaini's recollection – he remembered that (1) the group used a white Lexus SUV that day, not a van, 6/14/05 Tr. at 7066:2-4; (2) he was

---

[10] The Court notes for the record that Mr. Perry was represented by counsel and refused Defendant Aguiar's request for an interview prior to his recall in the defense case.  As such, it is highly unlikely that Mr. Perry would have consented to an interview with the defense and provided information beyond the details provided in his grand jury testimony prior to Mr. Chtaini's testimony in this case.

not the source of the car, *id*. at 7066:8-10; and (3) while Mr. Aguiar did not go with the group to the

bank that day, *id*. at 7064:25-7065:2, Mr. Aguiar was present when the group planned the

attempted robbery, put on their bulletproof vests, and gathered their weapons, *id*. at 7068:1-7069:1.

As such, virtually all of the inconsistencies between the prior statements of Mr. Perry and the

testimony of Mr. Chtaini identified post-trial by Defendant Morrow actually were elicited *seriatim*

from both Mr. Chtaini and Mr. Perry.  Indeed, at the end of the trial, these inconsistencies were

identified by various Defendants in the closing arguments and offered as a basis to reject the

credibility of both Messrs. Chtaini and Perry.  *See, e.g.*, 6/20/05 Tr. at 7863:17-7865:17 (counsel

for Defendant Aguiar emphasizes the discrepancies between Mr. Chtaini's testimony and Mr.

Perry's testimony in his closing argument before the jury).  Given these factors, unlike *Gil*, this is

not a case where the inconsistencies were not known to the defense or jury until after the trial or

where such inconsistencies were not vigorously argued.

(6) <u>Materiality of the Information</u>: As noted previously, the Second Circuit ordered a new

trial in *Gil*, given that (1) the memo in question that was "suppressed" was favorable to the

defendant; (2) the memo was material to his defense; and (3) "[t]here is a reasonable probability that

the disclosure of the memo would have resulted in a different outcome at trial, and the non-

disclosure seriously undermines the confidence in the verdict of guilty."  *Gil*, 297 F.3d at 105.  In

this case, the discrepancies focused on by Defendant Morrow are simply immaterial.  First, the

testimony focused on an event introduced only as evidence that certain Defendants and Mr. Chtaini

knew each other and associated together prior to the first bank robbery in this case.  The January 21,

2004 act was not charged as an offense, either as part of the Count I RICO Conspiracy or in any

substantive count against any Defendant.  Second, the discrepancies between Mr. Perry's grand jury

testimony and Mr. Chtaini's trial testimony are quite minor.  At the very least, both individuals

agreed that (1) Chtaini, Perry, Morrow, and Palmer planned and attempted to rob an armored car on

January 21, 2004; (2) the plan fell through, because the armored car never arrived; (3) Defendant

Aguiar had an awareness of the plot; (4) and the group decided to eat pizza in order to tide their

growing hunger. *Compare* 11/15/04 Perry Grand Jury Test. at 18-27 *with* 5/3/05 Tr. at 3186:4-

3215:21 (Chtaini trial testimony).  The differences cited to by Defendant Morrow, involving where

the pizza was delivered, who drove what vehicle,[11] and the exact route of the group's pre- and post-

attempt travels, simply pale in comparison to the great similarities between the two accounts,

thereby significantly decreasing the "impeachment" value of Mr. Perry's grand jury testimony on

Mr. Chtaini.  Third, as noted previously, the majority of these differences were elicited from Mr.

Perry in the defense case, and focused upon by the defense in closing arguments in an effort to

undermine Mr. Chtaini's credibility.  Fourth, and finally (taking all of the points discussed by the

Court into account), even had the jury been made aware of all identified difference while Mr.

Chtaini was still on the stand, the information would <u>not</u> have undermined confidence in the verdict

of guilty; there is <u>not</u> a "reasonable probability" that the information would have resulted in a

different outcome at trial.

Based on these considerations, the Court concludes that Defendants have failed to establish a

violation of the strictures of either *Brady* or the Jencks Act.  Rather, the immaterial information in

question was provided by the Government to the various defense counsel in a timely manner,

virtually all of the alleged minor inconsistencies were known to and exploited by the defense, and

the jury was fully capable of considering this information in evaluating the witnesses' credibility.

When compared to the facts in *Gil*, there are vast differences in timing, the available resources, the

---

[11] Indeed, there might actually not be a descriptive difference between an SUV and a van, depending upon how one defines such an automobile.

indexing of materials and amount of information involved, the "noticeability" of the documents, the use of the material during the trial, and the ultimate materiality and importance of the information in question. As such, the Court concludes that a new trial is not warranted with respect to Defendants' alleged *Brady* issue.

B.    *Consideration of Extraneous Evidence*

Defendants have focused on four central areas of alleged juror misconduct, namely: (1) a suggestion that Juror #12 visited the Industrial Bank at some point during the trial and brought extraneous information from her observations into the jury's deliberations; (2) an accusation that Juror #5 visited the area surrounding 9th, Kennedy, and Longfellow Streets where the April 23, 2004 AWIK of Edwin Arrington allegedly occurred, and brought extraneous information from her observations into the jury's deliberations; (3) an allegation that several members of the jury read the June 30, 2004 Washington Post article that – while a trial exhibit – had not been admitted for the truth of its contents; and (4) an assertion that Jurors #2 and #15 continued a relationship with Juror #4 following his dismissal from the jury during the latter portion of the trial. Defendants have also identified two other, more minor concerns, including (1) Juror #1's statement that many jurors were apparently familiar with the areas of Washington, D.C., where the charged crimes occurred, and (2) the United States Marshal's direction to the jurors on the last morning of deliberations that they should refrain from bringing magazines, books, and other materials into the jury room that may distract them from their continuing deliberations. In response, the Government contends that Juror #1's testimony at the October 31, 2005 evidentiary hearing does not support a finding that juror misconduct occurred, and – even assuming that such conduct did occur – no prejudice resulted from the conduct, thereby obviating the need for another evidentiary hearing or a new trial. *See* Gov't's Omnibus Resp. at 1, 5-6.

27

1.      Relevant Standards

Post-trial jury scrutiny is disfavored because of its potential to undermine "full and frank discussion in the jury room, jurors' willingness to return an unpopular verdict, and the community's trust in a system that relies upon the decisions of laypeople." *Tanner v. United States*, 483 U.S. 107, 120-21, 107 S.Ct. 2739, 97 L.Ed.2d 90 (1987). "Ordinarily, a verdict will not be upset on the basis of a juror's post-trial report of what occurred in the course of deliberations." *United States v. Campbell*, 684 F.2d 141, 151 (D.C. Cir. 1982) (citations omitted). "Only in extraordinary circumstances do courts inquire into the deliberative process of juries," with "[t]he single exception" concerning "'extraneous influences' that may have improperly influenced the verdict." *Id.*

> "Extraneous influence" has been construed to cover publicity received and discussed
> in the jury room, consideration by the jury of evidence not admitted in court, and
> communications or other contact between jurors and third persons, including
> contacts with the trial judge outside the presence of defendant and his counsel.  By
> contrast, evidence of discussions among jurors, intimidation or harassment of one
> juror by another, and other intra-jury influences on the verdict is within the rule,
> rather than the exception, and is not competent to impeach a verdict.

*United States v. Wilson*, 534 F.2d 375, 378-79 (D.C. Cir. 1976) (quoting *Gov't of the Virgin Islands v. Gereau*, 523 F.2d 140, 149-50 (3d Cir. 1975), *cert. denied*, 424 U.S. 917, 96 S.Ct. 1119, 47 L.Ed.2d 323 (1976)).  The prevention of prejudicial extraneous influences on a jury's deliberations is essential, as Justice Holmes observed:  "The theory of our system is that the conclusions to be reached in a case will be induced only by evidence and argument in open court, and not by any outside influences, whether of private talk or public print." *Patterson v. Colorado*, 205 U.S. 454, 462, 27 S.Ct. 556, 51 L.Ed. 879 (1907).

A court's post-trial inquiry into a jury's deliberative process is constrained by the strictures of Rule 606(b) of the Federal Rules of Evidence, which provides:

Upon an inquiry into the validity of a verdict or indictment, a juror may not testify as to any matter or statement occurring during the course of the jury's deliberations or to the effect of anything upon that or any other juror's mind or emotions as influencing the juror to assent to or dissent from the verdict or indictment concerning the juror's mental processes in connection therewith, except that a juror may testify on the question whether extraneous prejudicial information was improperly brought to the jury's attention or whether any outside influence was improperly brought to bear upon any juror.  Nor may a juror's affidavit or evidence of any statement by the juror concerning a matter about which the juror would be precluded from testifying be received for these purposes.

Fed. R. Evid. 606(b).  "The exception for improper outside influence allows testimony about the fact and nature of the contact (the input, as it were), but not about the effect it produced on the juror's state of mind."  *United States v. Williams-Davis*, 90 F.3d 490, 496 (D.C. Cir. 1996) (citations omitted).  "When an extraneous influence is shown, the court must apply an objective test, assessing for itself the likelihood that the influence would affect a typical juror."  *Bibbins v. Dalsheim*, 21 F.3d 13, 17 (2d Cir. 1994), *cert. denied*, 513 U.S. 901, 115 S.Ct. 261, 130 L.Ed.2d 181 (1994); *see also United States v. Ianniello*, 866 F.2d 540, 544 (2d Cir. 1989) (directing consideration of effect of extra-record information on "hypothetical average jury").

As such, while extra-record information that becomes known to a jury is "presumptively prejudicial," *Remmer v. United States*, 347 U.S. 227, 229, 74 S.Ct. 450, 98 L.Ed. 654 (1954), such a presumption is not conclusive, and may be overcome by a showing that the extra-record information was harmless, *id.* at 229, 74 S.Ct. 450.  In this analysis, the innocuous nature of the information or contact will have a bearing on the question of whether prejudice has actually occurred.  *See Leisher v. Conrad*, 41 F.3d 753, 756 (D.C. Cir. 1994); *United States v. Williams*, 822 F.2d 1174, 1188 n.147 (D.C. Cir. 1987).  The ultimate inquiry becomes:  "Did the intrusion affect the jury's deliberations and thereby its verdict?"  *United States v. Olano*, 507 U.S. 725, 739, 113 S.Ct. 1770, 123 L.Ed.2d 508 (1993).  While the Government has the burden to prove that any

extraneous information or contact was harmless, *see Williams-Davis*, 90 F.3d at 497, it may do so

by showing (1) that any extraneous remarks or information was "isolated," *id.*; (2) that the

information in question was merely cumulative or duplicative of properly admitted evidence, *id.* at

500; *Dallago v. United States*, 427 F.2d 546, 559 (D.C. Cir. 1969); *United States v. Treadwell*,

760 F.2d 327, 339 (D.C. Cir. 1985); (3) the information was "relatively innocuous," *United States*

*v. Butler*, 822 F.2d 1191, 1196 (D.C. Cir. 1987); or (4) that the Government's evidence was

"overwhelming," thereby "making the chance that [the] exposures could have affected the verdict

exceedingly remote," *Williams-Davis*, 90 F.3d at 501; *Dallago*, 427 F.2d at 558 (reversal because

of presence of unadmitted document in jury room would not be appropriate where other proof of

guilt was "overwhelming": "Certainly the weight of the prosecution's evidence becomes relevant in

estimating what effect the error had or reasonably may be taken to have had upon the jury's

decision.") (citation omitted); *United States v. Smith*, 85 F.3d 646, 646 (D.C. Cir. 1996) (denying

petition for rehearing).  Moreover, "[t]he burden of establishing harmlessness, which is placed on the

government, is made less demanding by the trial judge's participation and use of all the tools

necessary to evaluate the relevant facts."  *Butler*, 822 F.2d at 1196.

As the D.C. Circuit has repeatedly stressed, "[t]he trial court is obviously the tribunal best

qualified to weigh the relevant factors [regarding juror misconduct] and draw the conclusion

appropriate [sic]."  *Williams*, 822 F.2d at 1189; *see also United States v. Fafowora*, 865 F.2d 360,

363 (D.C. Cir. 1989) (stressing deference to district court's assessment of effect of third-party

communications); *Butler*, 822 F.2d at 1196 (same).  "The district court's factual determinations

regarding the alleged misconduct are 'entitled to great weight, and [in the absence of new facts]

ought not to be disturbed unless . . . 'manifestly unreasonable.'" *United States v. White*, 116 F.3d

30

903, 929-930 (D.C. Cir. 1997) (per curium) (quoting *Hobson v. Wilson*, 737 F.2d 1, 49 (D.C. Cir. 1984), *cert. denied*, 470 U.S. 1084, 105 S.Ct. 1843, 85 L.Ed.2d 142 (1985)).  Accordingly, the "trial court has wide latitude in determining the method of inquiry into possible prejudice." *Leisher*, 41 F.3d at 756 (citing *Williams*, 822 F.2d at 1189-90); *see also White*, 116 F.3d at 929 (same).

The Court of Appeals reviews the district court's choice of procedures to investigate the alleged juror misconduct for abuse of discretion.  *Williams-Davis*, 90 F.3d at 497.  "Among the factors [the court] should consider are the strength and seriousness of the allegations."  *White*, 116 F.3d at 116.  The D.C. Circuit has "explicitly rejected any automatic rule that jurors are to be individually questioned." *Williams-Davis*, 90 F.3d at 499 (citing *Williams*, 822 F.2d at 1190 n.162); *see also Leisher*, 41 F.3d at 756 ("While there are times when the threat of prejudice is significant enough to require a separate examination of jurors, there is no *per se* rule that individual questioning is always required.").  The "inquiries put to the juror need only be sufficiently detailed to permit the judge to determine whether any prejudice is likely to result." *Butler*, 822 F.2d at 1196.  The court should consider "among the factors militating against extending the inquiry[] the risk that massive examination and cross-examination would in fact amount to 'juror harassment.'" *Williams-Davis*, 90 F.3d at 499.  Importantly, "where the court conducts an inquiry broad enough to lead it to a reasonable judgment that there has been no prejudice, on an assumption as to the facts favorable to defendants' claim, it has fulfilled its procedural as well as its substantive duty."  *Id.*

2.      Application

In this case, the relative opaque nature of the accusations of juror misconduct made by Defendants in their initial filings, coupled with the failure by Defendants to attach any affidavit from a juror documenting any concerns, convinced the Court that the best path to achieve a complete and

accurate idea of potential juror misconduct would be to conduct an evidentiary hearing with the complaining juror(s). As such, with all parties and their counsel present, the Court conducted an evidentiary hearing regarding jury misconduct on the record on October 31, 2005. Only one juror, Juror #1, testified at the hearing. Juror #1 was also the only individual who decided to contact the defense following the trial, and was the sole source of many of Defendants' representations in their early post-trial motions. Upon a review of the record adduced at the October 31, 2005 hearing, the Court – in employing its discretion – finds that a more invasive hearing involving other members of the jury is unnecessary and not in the interests of justice. Rather, the likelihood of prejudice from the identified "misconduct" is too insignificant to warrant more extensive "harassment" of the jury. Accordingly, the Court shall turn to Defendants' various motions for a new trial. In analyzing Defendants' collective motions, the Court shall examine: (1) the two alleged visits by jurors to crime scenes; (2) the allegation that members of the jury read the June 30, 2004 Washington Post article which had been admitted into evidence for purposes other than the truth of its contents; and (3) the contention that members of the jury maintained contact with a dismissed juror. In doing so, the Court shall also touch on the two other generalized points made by Juror #1 at the October 31, 2005 evidentiary hearing.

a.      *Alleged Visits to Crime Scenes*

At the October 31, 2005 hearing, Juror #1 testified that he was able to infer two possible visits by members of the jury to scenes at issue in Defendants' criminal trial, despite the Court's repeated admonitions to avoid such areas. First, Juror #1 claimed that Juror #12 hinted that she had gone to the Industrial Bank during the trial, given her "body language" and her comment that the area behind the teller's booth was "small." 10/31/05 Hrg. Tr. at 36:10-21, 53:20-21. However, Juror #1 also stated, "I don't know when she was there exactly," *id.* at 36:18, and indicated that no

32

juror questioned the timing of the alleged visit when the comment was made by Juror #12, *id.* at

108:9-14.  Once Juror #12 concluded by saying something to the effect of "'Well, yes, I've been to

that bank,'" the other jurors "just dropped" the topic and sought no further information.  *Id.* at

53:15-54:2.  Indeed, many of the jurors considered the comment wholly irrelevant to their

deliberations regarding the alleged robbery of the Industrial Bank.  *Id.* at 38:17-21, 100:15-20.

Second, Juror #1 also testified that he was able to infer that Juror #5 frequently drove by the

area between 9th, Kennedy, and Longfellow Streets where the alleged April 23, 2004 AWIK of

Edwin Arrington occurred.  According to Juror #1, Juror #5 stated that "she goes by there all the

time," *id.* at 39:12-16, and volunteered that witness Antwon Perry could have seen Defendants

Morrow and Stoddard running out of an alley after the alleged assault from his vantage point while

he was walking out of a nearby liquor store, *id.* at 54:4-16.  However, Juror #5 gave no indication

as to when exactly she would have been driving by the location of the alleged AWIK, *id.* at 38:5-10,

and the discussion "was dropped" immediately by the other jurors following her comment, *id.* at

54:4-16.

### i.  No Prejudice to Defendants

Assuming *arguendo* that these described "visits" did occur during the trial, these visits –

taken individually or collectively – are insufficient to have prejudiced Defendants, i.e., the visits

could not have affected the jury's deliberations and altered the verdict.  Three considerations support

this finding.

First, the visit to the 9th, Kennedy, and Longfellow Street area was particularly *irrelevant*

for the purposes of prejudice, as Defendants Morrow and Stoddard – the only Defendants charged

with the AWIK offense – were *acquitted* of Count XVIII, the substantive charge stemming from the

alleged April 23, 2004 AWIK.  *See* Morrow Verdict Form at 9; Stoddard Verdict Form at 4.  While

the jury did find that the AWIK charge had been "proven" as a "racketeering act" under Count I,

*see* Morrow Verdict Form at 3; Stoddard Verdict Form at 2, the jury also concluded that the

Government had "proven" seven other "racketeering acts" against Defendant Morrow as part of the

RICO Conspiracy charge, *see* Morrow Verdict Form at 1-3, and that the Government also had

"proven" three other "racketeering acts" against Defendant Stoddard as part of the Count I charge,

*see* Stoddard Verdict Form at 1-2.  Accordingly, even if the AWIK racketeering act finding of

"proven" was reversed, Defendants Morrow and Stoddard would still have faced conviction under

the Count I RICO Conspiracy charge.  As such, Defendants cannot show any prejudice resulting

from Juror #5's alleged visit to the Kennedy and Longfellow Street area.

Indeed, as noted, *supra* n.6 & n.7, a reading of the verdict makes it apparent that the jury

concluded that Defendants Morrow and Stoddard did not commit the actual attack on Mr. Arrington

on April 23, 2004, but found that they were involved in a larger conspiracy to assault Mr. Arrington

in order to preserve the spoils of their RICO enterprise.  No prejudice can flow from Juror #5's visit

arising from this finding.  First, this conspiracy verdict was supported by evidence independent of

Mr. Perry's eye-witness account of the alleged April 23, 2004 AWIK and unrelated to any visit to

the area by Juror #5 – e.g., the testimony of Mr. Chtaini describing the motives that Defendants

Morrow and Stoddard may have had to assault and/or kill Mr. Arrington.  Specifically, Mr. Chtaini

indicated that Mr. Arrington had apparently stolen a weapon out of the conspirators' arsenal;

according to Mr. Chtaini, Defendants Morrow and Stoddard were particularly ready to exact

retaliation upon Mr. Arrington for this theft to protect the enterprise's reputation and stockpile of

armaments.  Second, as already mentioned, even removing this event from the RICO Conspiracy,

Defendants Morrow and Stoddard still would have been convicted of that conspiracy.  Third, this

event – the April 23, 2004 AWIK of Mr. Arrington – is somewhat removed from the central events

in this case (the armed robbery of six banks) and the 18 U.S.C. § 371 conspiracy charged in Count

II, thereby cabining any spillover "prejudice" flowing to other charges or other Defendants that

would have somehow resulted from this asserted visit to the scene.

Second, any evidence that could have been gleaned from a visit to the Industrial Bank would

be entirely cumulative of the Government's evidence admitted at trial, and largely irrelevant to the

facts at issue.  Importantly, the defense at trial to the bank robbery was not that the crime did not

occur; rather, all Defendants claimed that the cooperating witnesses, i.e., Messrs. Chtaini, Perry, and

Holmes, lied when they implicated Defendants.  *See, e.g.*, 6/20/05 Tr. at 7809-10 (Defendant

Morrow's attorney argues that while "[t]here is no question these bank robberies occurred," "the

focus of our defense" is whether Defendants were involved).  A juror going to observe a scene nearly

one year after the events at issue could obtain no relevant information about who committed the

crime – the relevant issue that the jury had to decide.  Indeed, a reasonable juror would have

considered the information added by Juror #12 about the size of the teller area at the Industrial Bank

to be totally irrelevant to the identification of the robbers, just like Juror #1.  10/31/05 Hrg. Tr. at

38:17-21, 100:15-20.  Moreover, the Government introduced numerous photographs at trial of the

Industrial Bank[12] (which do show the teller area) and numerous witnesses testified describing the

scenes.  Any information that a juror could discern from visiting the scene would be cumulative with

respect to what that juror already knew from the evidence at trial, particularly with respect to

_____

[12] The Government introduced and admitted into evidence photographs from Industrial Bank taken during the robbery.  *See, e.g.*, 5/4/05 Tr. at 3395-96 (Government admits into evidence photograph from the Industrial Bank robbery taken while the robbery was in progress and questions Mr. Chtaini regarding the photograph; Mr. Chtaini then identifies Defendant Aguiar as the individual in the photograph).

identification.  This situation is similar to the one encountered by the D.C. Circuit in *Williams-Davis*, where a juror and alternate drove into the relevant neighborhood.  The D.C. Circuit found that this "drive could not possibly have been prejudicial because, during trial, the jurors had repeatedly viewed enlargements of aerial photographs and street photographs of the R Street neighborhood."  *Williams-Davis*, 90 F.3d at 504 (citing *Bibbins*, 21 F.3d at 17 (in light of introduction of crime scene photographs at trial, relaying of extra-record information by a juror familiar with the crime scene was cumulative)).

Third, the Government's evidence as to the guilt of the Defendants charged with the Industrial Bank robbery – Defendants Morrow, Stoddard, Aguiar, and Burwell – was overwhelming, and the "size" of the teller area was not a contested issue at trial.  *See Williams-Davis*, 90 F.3d at 501; *Dallago*, 427 F.2d at 558.  A review of the record indicates that the Government's evidence as to the relevant crimes was supported by a plethora of testimonial, ballistic, photographic, and scientific evidence.  With this deluge of strong evidence at hand, whatever slight subjective "extraneous" information on an uncontested issue that might have been provided by a juror visiting the scene would simply be insufficient to affect the jury's deliberations or ultimate verdict in this matter.  Given that the Government has established that Defendants could not have been prejudiced by the alleged visits, if they did in fact occur, the Court concludes that neither a new trial nor another evidentiary hearing is warranted.

ii.      No Issue With the Answers Provided in *Voir Dire*

As discussed in Defendant Perkins' January 24, 2006 Supplement to his Motion for a New Trial, assuming that Jurors #12 and #5 had actually visited these scenes prior to trial, and not during trial, there is the possibility that these jurors failed to disclose this information during the *voir dire* process leading up to trial.

During the *voir dire* process, the Court relayed certain information regarding the charges against each Defendant.  In relevant part, the Court noted that "Defendants Morrow and Stoddard are charged with shooting a man named Edwin Arrington and a bystander, Bonita Cobb[,] near the 900 block of Longfellow Street, Northwest in the District of Columbia on April 23, 2004.  Neither victim died as a result of the injuries."  4/5/05 Tr. at 24:6-10.  The Court further mentioned that "Defendants Morrow, Aguiar, Burwell, and Stoddard and a co-conspirator are charged with robbing the Industrial Bank located at 2012 Rhode Island Avenue, Northeast in Washington, D.C. on June 12, 2004."  *Id*. at 25:1-4.  Under "Question Number Six," the Court instructed the prospective jurors:

> Now, I've given you certain addresses.  Do any of you live or work near or have some special familiarity with the immediate area where the offenses are alleged to have occurred or in some way are you familiar with it?
>
> So special familiarity means not just that you know where it is in the city, but it may be that you visit friends or relatives or something of that nature, not just that you know what quadrant or where it is or you drive by it.  But someplace where you would frequent for some particular reason.  So if you live, work or have the special familiarity, in other words you frequent this area for whatever reason, please put number six down.  If you don't, don't put anything down.

*Id*. at 27:9-21.  Neither Juror #5 (who allegedly "drove by" the area around 9th and Kennedy Streets, N.W., where Mr. Perry testified that he was walking away from a liquor store while he saw Defendants Morrow and Stoddard running out of an alley following the April 23, 2004 Arrington AWIK) nor Juror #12 (who allegedly had "been to" the Industrial Bank) put down Question Number 6 on their juror cards, and therefore were not questioned as to their knowledge of or contact with those areas by counsel or the Court.  *See, e.g.*, 4/6/05 Tr. at 315:4-10 (Prospective Juror #407, who becomes Juror #5, is not questioned regarding Question Number Six); 4/7/05 Tr. at 496:14-15 (Prospective Juror #2817, who becomes Juror #12, is not questioned regarding Question Number

Six).

Upon a review of this *voir dire*, two points are in order.  First, based on the wording of the information provided to the prospective jurors and the Court's questioning, it does not appear that Jurors #5 and #12 actually failed to disclose information.  The Court's Question Number Six focused on whether prospective jurors had a "special familiarity" with a location, not just a general familiarity with an area that could have been garnered when they "drive by" it.  Accordingly, the fact that Juror #5 might have driven by 9th and Kennedy Streets, N.W., or Juror #12 might have been to the relevant Industrial Bank would not necessarily entail that they had a "special familiarity" with the locations that obliged them to put down Question Number Six and answer questions regarding their level of contact.   Moreover, there could also be some question as to whether Juror #5 actually *failed* to inform the Court of her knowledge of the area where Mr. Arrington was shot, since the area inquired into on *voir dire* was the area of the 900 block of Longfellow Street, N.W., where the assaults took place, while the area that she allegedly "drove by" and raised during deliberations was at 9th and Kennedy Streets, N.W., where Mr. Perry testified that he was walking away from a liquor store while he saw Defendants Morrow and Stoddard running out of an alley.  *See White*, 116 F.3d at 930 ("[w]ith no evidence of dishonesty [in response to *voir dire* questions], there was no need for the district court to examine the issue further").  Accordingly, there is no significant evidence suggesting that the two jurors in question – Jurors #5 and #12 – were in any way dishonest or failed to disclose information during *voir dire*.

Second, even assuming *arguendo* that these jurors did actually "fail to disclose information" during *voir dire*, Defendants cannot meet the strict standard necessary to establish the need for a new trial.  The D.C. Circuit has established the rule that:

> For reversal because of a juror's failure to disclose information at voir dire, the
> Supreme Court requires the complaining party to show that the juror "failed to
> answer honestly a material question on voir dire, and then further show that a correct
> response would have provided a valid basis for a challenge for cause.  The motives
> for concealing information may vary, but only those reasons that affect a juror's
> impartiality can truly be said to affect the fairness of a trial."

*Williams-Davis*, 90 F.3d at 503 (quoting *McDonough Power Equip., Inc. v. Greenwood*, 464 U.S.

548, 556, 104 S.Ct. 845, 78 L.Ed.2d 663 (1984) (plurality)); *see also United States v. North*, 910

F.2d 843, 904 (D.C. Cir. 1990) ("Read along with the concurrences of five Justices, *McDonough*

suggests that an aggrieved party must show that the juror's correct response at voir dire would have

demonstrated actual bias.").  Court of Appeals reviews the district court's determination for abuse of

discretion.  *Id.* (citing *United States v. Boney*, 68 F.3d 497, 502 (D.C. Cir. 1995)).

Here, assuming *arguendo* that the two jurors at issue did fail to indicate familiarity with

certain crime scenes during *voir dire*, such an omission was trivial.  Even had the omission not

occurred and the jurors been forthright with their apparent knowledge, such information would not

have provided a valid basis for a challenge for cause.  Failure to volunteer such information cannot

be said to have affected the fairness of the trial, especially given the considerations outlined by the

Court above involving cumulative and overwhelming evidence.  *See Williams-Davis*, 90 F.3d at

503 (finding that a juror's failure to respond to a question as to his familiarity with a neighborhood

where defendants allegedly sold illegal drugs "does not remotely satisfy the daunting *McDonough-*

*North* standard").[13]  Once again, even assuming that the identified visits did occur, Defendants are

---

[13] This analysis applies equally to any other potential familiarity that other jurors may have
had with the crime scenes at issue.  Juror #1 noted that he felt that several members of the jury had
at least some understanding of the neighborhoods and areas where the events at issue occurred.  *See*
10/31/05 Hrg. Tr. at 42:13-24; *see also id.* at 52:2-14.  Such a familiarity, even if not made explicit
during *voir dire*, would not be sufficient to constitute a challenge for cause.  As such, Defendants
cannot establish prejudice resulting from any familiarity.  Moreover, the Court notes that in a
jurisdiction as physically small as the District of Columbia, it is quite likely that jurors will

not entitled to a new trial or further hearing.

> b.    *Alleged Reading of the June 30, 2004 Washington Post Article*

At the October 31, 2005 evidentiary hearing, Juror #1 also remarked that several members

of the jury had read a June 30, 2004 edition of the Washington Post, which contained an article

entitled "Gang Stages Sixth Bank Holdup; Men With Rifles Fire Shots in Connecticut Ave. Branch,

Take $50,000." *See* 10/31/05 Hrg. Tr. at 30:2-9.  This article was offered and accepted into

evidence not for the truth of its contents but because (1) it contained a photograph of masked and

armed individuals exiting the SunTrust Bank with their robbery proceeds, and (2) it was discovered

by police underneath Defendant Perkins' bed at his residence.  Defendants now contend that the

reading of this article by the jurors caused them undue prejudice such that a new trial is warranted.

Upon an analysis, the Court concludes that the Government has established that no prejudice

could have resulted from any reading of the article at issue by members of the jury.  First, the Court

notes that Defendants did not object to the admission of the newspaper article as an exhibit at trial,

*see also* Gov't's Ex. Brinkley #27 (original, admitted June 30, 2004 Washington Post article), and

are now in no position to complain about prejudice stemming from its contents at this point.  Second,

and more importantly, a reading of the article – published prior to the apprehension of any of the

individuals ultimately charged with the crimes at issue – reveals that its contents are innocuous

and/or merely cumulative of the evidence heard and admitted at trial.  In sum, the article related that

a bank robbery at the SunTrust Bank had occurred, and that the robbery was similar to five other

robberies in the area – facts which were not even remotely in dispute at the trial.  The article did not

report that anyone had been charged with the crime or was a suspect (information that was not

_____

frequently have some level of knowledge regarding the sites in question; such knowledge – by itself
– is insufficient to prejudice criminal defendants in general or constitute a challenge for cause.

known until weeks after publication), it contained no significant or detailed description of the

suspects, and its contents in no way linked Defendants specifically to the crimes ultimately

charged.[14]   Accordingly, the Court concludes that even if the content of the Washington Post article

could be considered "extraneous," any contact or consideration of the contents could not have

prejudiced Defendants.  *See Williams-Davis*, 90 F.3d at 500, 502 (when discussing newspaper

articles about the trial that jurors may have read, the trial court "found '[w]hat little extra-judicial

information each article did contain about defendants was merely duplicative of evidence already

introduced in open court,'" while the Court of Appeals concluded that there was "no error in the

scope of the district court's inquiry and its finding of no prejudice from the almost entirely

cumulative material.").

> c.      *Contact With Dismissed Juror*

Finally, at the October 31, 2005 evidentiary hearing, Juror #1 testified that both Juror #2

and Juror #15 had indicated, during the deliberations period in this case, that they remained in

contact with dismissed Juror #4.  *See* 10/31/05 Hrg. Tr. at 39:17-40:2.  According to Juror #1, he

was able to infer that Juror #2 still had contact with dismissed Juror #4 because "during the last

week of deliberations," *id*. at 40:23-25, Juror #2 notified him that some of the jurors were planning

"an after-verdict picnic" for August 6, 2005, asked him if he would like to attend, and informed him

that "Chef," i.e., dismissed Juror #4, "would be fixing the food," *id*. at 40:5-13.  Juror #1 also

assumed that Juror #15 still had some contact during this period with dismissed Juror #4 (1) because

---

[14] The Court notes that another piece of evidence admitted for the jury's consideration was an actual video, captured by a WTTG-TV (Channel 5) cameraman, that showed the robbers exiting the SunTrust Bank and fleeing from the robbery site.  The picture on the June 30, 2005 Washington Post article of this robbery was actually a still taken from this video.  Much of the information provided by the Washington Post article was essentially duplicative of this piece of admitted evidence.

Juror #2 apparently mentioned to him that Juror #15 was also going to be at the planned August 6, 2005 post-verdict picnic, *id.* at 40:19-25, and (2) because Juror #15 had defended dismissed Juror #4 from another juror's criticism by stating, "'Don't talk bad about my friend, Chef,'" *id.* at 40:18. *See also id.* at 67:13-22, 75:23-76:7.  According to Juror #1, he had no knowledge of any contact beyond these statements, and Jurors #2 and #15 never made any statements within his presence indicating that they had discussed the case with dismissed Juror #4.  *Id.* at 41:23-42:2 (when asked "[D]id they make any statements that indicated that they had discussed the case with Chef?," Juror #1 replied, "No.").

It is not unusual for jurors to develop personal relationships with each other, and there is nothing *per se* wrong with the situation.  Indeed, assuming that a jury has not been sequestered, nothing restricts jurors from forming new bonds and developing new friends during the course of a trial, either with other jury members or with outside individuals.  Here, the testimony by Juror #1 at most shows that two jurors remained in contact with a dismissed juror such that an *after-verdict* picnic could be planned to commemorate the three-and-a-half months spent together by the jury during this trial.  Juror #1's testimony does not show any misconduct – i.e., nothing indicates that these jurors ever discussed the issues surrounding the case or their decision-making processes with the dismissed juror, and nothing points to a finding that dismissed Juror #4 somehow had improper influence on a sitting juror.  Defendants simply have no other evidence of "improper" contacts, and instead resort to extremely tenuous claims to justify the need for a further hearing.  In the absence of any evidence indicating any impropriety whatsoever with the identified continued contact, the Court refuses Defendants' invitation to conduct a further evidentiary hearing by recalling all jurors in order to question them about their relationship with dismissed Juror #4.  Further hearings would simply constitute a baseless "fishing expedition" into an unfounded pond, recalling the words of

Henry Wadsworth Longfellow, "With useless endeavor/ Forever, forever,/ Is Sisyphus rolling/ His

stone up the mountain!"  *See* Henry Wadsworth Longfellow, *Chorus of Eumenides*, THE MASQUE

OF PANDORA AND OTHER POEMS (1875).  Quite simply, the circumstances adduced by Defendants

do not approach those other, far more egregious cases where the D.C. Circuit has previously found

that no "prejudice" occurred and no new trial was warranted despite third-party contacts with the

jury.  *See, e.g.*, *Williams-Davis*, 90 F.3d at 495, 497 (forewoman's husband urged her to "nail"

defendants); *Fafowora*, 865 F.2d at 363-64 (third-party told juror he would give "anything" for

information on elevator); *Butler*, 822 F.2d at 1194-96 (defendant approached juror in elevator,

complimented her, and told her his version of the events at issue, whereupon most of the jury learned

of the incident); *Williams*, 822 F.2d at 1186, 1189-90 (defense witness contacted three jurors,

inquired into the status of deliberations, and complained that the deliberations were only continuing

so jurors could collect fees, and where entire jury learned of incident).  Given these factors, the

Court shall deny Defendants' various motions for a new trial or for further hearings.[15]

### III: CONCLUSION

For the reasons set forth above, the Court shall deny Defendants' various motions for a new

trial or further evidentiary hearings in this matter.  An Order accompanies this Memorandum

---

[15] Defendant Palmer makes an issue out of Juror #1's comment that the marshal told the jurors not to bring in "newspapers and radios and books," *see* 10/31/05 Hrg. Tr. at 50-51, into the jury room that might delay the jury's deliberations.  *See* Def. Palmer's Suppl. Post-Trial Mot. for Voir Dire of Trial Jurors at 3, ¶ 2(vii).  Defendant Palmer then makes a logical leap in his argument, assuming that the newspapers in question were "the Washington Post [which] carried articles that were biased towards the prosecution and strongly prejudicial to the defendants."  *Id.*  Defendant Palmer has no evidence to support this allegation, and Juror #1 offered no testimony whatsoever to support this groundless speculation.  Rather, the only Washington Post article identified by Juror #1 as having been read by the jurors during the trial was the June 30, 2004 article admitted into evidence.  Baseless conjecture and wild accusations are not sufficient to warrant a new trial or a further evidentiary inquiry into the jury's deliberative process in this case.

Opinion.


Date:   February 1, 2006


_____/s/_____
COLLEEN KOLLAR-KOTELLY
United States District Judge