UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

---

UNITED STATES OF AMERICA,

v.

MIQUEL MORROW, *et al.*,

Defendants.

Criminal Action No. 04-355 (CKK)

---

**MEMORANDUM OPINION**
(April 26, 2006)

Following the Court's denial of Defendants' first set of new trial motions on February 1,

2006, *see United States v. Morrow*, 412 F. Supp. 2d 146 (D.D.C. 2006), Defendant Morrow filed a

Second Motion for a New Trial pursuant to Federal Rule of Criminal Procedure 33 four days before

his scheduled sentencing. The Court then allowed Defendant Morrow's five other co-defendants to

join in his motion to allow the definitive resolution of the issues set forth in his motion.[1] Defendants

now move for a new trial or an evidentiary hearing based upon an allegation that Juror #2

(originally, Prospective Juror #0769), the foreperson on the jury, lied or omitted facts during *voir*

*dire* on April 5, 2005 concerning her relationship with a person unrelated to this case who had

allegedly been charged with or convicted of assault. Upon a searching examination of Defendant

---

[1] On April 9, 2006 and April 10, 2006, respectively, Defendants Aaron Perkins and Lionel Stoddard filed formal motions to join Defendant Morrow's Second Motion for a New Trial. The Court granted these motions to join in a Scheduling Order dated April 10, 2006. *See United States v. Morrow*, Crim. No. 04-355(CKK) (D.D.C. Apr. 10, 2006) (Scheduling Order). On April 20, 2006, Defendant Malvin Palmer also filed a formal Motion to Join Defendant Morrow's Motion to Reopen Motion for New Trial, which the Court shall grant. Finally, while Defendants Carlos Aguiar and Bryan Burwell did not submit formal filings on this issue, counsel for each Defendant indicated to the Court during telephonic conferences held with the Government and the Court on April 10-12, 2006, that they wished to join Defendant Morrow's motion. As such, the Court shall consider Defendant Morrow's Second Motion for a New Trial as applying to all six co-Defendants, and shall consider the arguments made in each Defendant's filings as applicable to all other co-Defendants.

Morrow's Second Motion for a New Trial, the Government's Opposition, the Replies filed by

numerous Defendants,[2] the attached exhibits, the relevant case law, and the entire record herein, the

Court shall deny Defendants' Second Motion for a New Trial.

## I: BACKGROUND

### A.    The Relevant Charges

On February 15, 2005, the Grand Jury in the above-captioned case returned a twenty count

Superseding Indictment against the six remaining defendants[3] in this case -- Miquel Morrow, Lionel

Stoddard, Carlos Aguiar, Bryan Burwell, Aaron Perkins, and Malvin Palmer (collectively,

"Defendants").[4]  Count I of the Indictment charged all six Defendants with a conspiracy to

participate in a Racketeer Influenced Corrupt Organization ("RICO"), in violation of 18 U.S.C. §

1962(d), based upon alleged racketeering acts involving armed robberies of four banks in the

District of Columbia (Acts 1-4) and two banks in the District of Maryland (Acts 5-6), as well as

---

[2] In addition to the various motions to join, on April 20, 2006, Defendant Stoddard submitted a Supplemental Motion to Defendant Morrow's Second Motion for a New Trial, Defendant Perkins submitted a Reply to Government's Response in Opposition to Defendant Morrow's Second Motion for a New Trial, and Defendant Morrow submitted a Reply to the Government's Opposition to his Second Motion for a New Trial.  On April 24, 2006, Defendant Morrow filed a Supplemental Affidavit to his Reply, attaching an affidavit from his investigator, Dale Vaughn, summarizing Mr. Vaughn's April 21, 2006 conversation with Juror #2's mother that elicited additional background facts.

[3] Messrs. Nourredine Chtaini, Omar Holmes, and Guidel Olivares were also associated with the Defendants as part of the relevant conspiracies, but cooperated with the Government and therefore were not defendants in this trial.

[4] Previous Indictments were handed down by the Grand Jury on August 5, 2004 and November 9, 2004.  Due to the motions schedule, which was aimed at surfacing the relevant issues and facts at the earliest possible point, a majority of the motions filed by the Government and the Defendants used the numbering scheme present in the November 9, 2004 Superseding Indictment when referring to specific counts.  However, for the purposes of complete accuracy, the Court will refer to the structure and scheme employed by the February 15, 2005 Superseding Indictment, as it was the controlling Indictment at trial.

three acts involving murder (Acts 7-9).  Count II charged all six Defendants with a conspiracy to

commit offenses against the United States, in violation of 18 U.S.C. § 371, by "unlawfully and

knowingly" combining, conspiring, confederating, and agreeing "to assault and put in jeopardy the

life of persons by the use of dangerous weapon[s] in the commission of the offense of bank robbery,

in that they would, while armed with firearms, by force and violence, against resistance and by

putting in fear, steal and take from persons and from the immediate actual possession of persons,

property of value, that is, money belonging to, and in the care, custody, control, management, and

possession of banks, the deposits of which were then insured by the Federal Deposit Insurance

Corporation, in violation of Title 18 United States Code, Sections 2113(a) and (d)."

Substantive charges involving armed bank robbery (Counts III, VII, X, XV) in violation of

18 U.S.C. §§ 2113(a), (d) and 18 U.S.C. § 2; using and carrying a firearm during a crime of

violence (Counts IV, VIII, XI, XVI) in violation of 18 U.S.C. §§ 924(c)(1)(A)(i)-(iii), (B)(i)-(ii),

and 18 U.S.C. § 2; unlawful possession of a firearm by a convicted felon (Counts V, VI, IX, XII-

XIV, XVII, XX) in violation of 18 U.S.C. § 922(g)(1); and assault with intent to kill (Counts XVIII,

XIX) were charged against the specific Defendants named in those counts.[5]  The armed bank

robberies were allegedly accomplished while the Defendants brandished weapons and wore body

armor, hoods, masks, bandanas, and heavy clothing to avoid identification.  The assaults also

involved the use of firearms.

---

[5] Count XX, a charge of unlawful possession of a firearm by a felon in violation of 18
U.S.C. § 922(g)(1) against Defendant Carlos Aguiar, was the only substantive offense that does not
arise directly out of one of the bank robberies alleged.  Rather, this count arose from the fact that
Defendant Aguiar possessed a firearm when he was stopped by police and arrested on August 4,
2004.

According to the Superseding Indictment, the purposes of the RICO conspiracy charged in Count I

> included, among other things, the following: (i) committing robberies, including bank robberies, in the District of Columbia, the District of Maryland, and elsewhere for the purposes of obtaining money and other things of value; (ii) protecting members of the enterprise; (iii) maintaining in safe places the weapons, body armor, and money of the enterprise; and (iv) retaliating against persons who interfered with the operation of the enterprise, including the actual and perceived thefts of weapons by non-members of the enterprise.

Superseding Indictment (Count I) ¶ 7.  The objects of the Section 371 conspiracy charged in Count II are similar:  "to obtain money and other things of value; to protect members of the conspiracy; and to maintain in safe places the weapons, body armor, and money of the conspiracy."  *Id*. (Count II) ¶ 3.  Each charged conspiracy is alleged to have operated "from on or about January 21, 2004 . . . up to and including on or about August 5, 2004, within the District of Columbia, the District of Maryland, and elsewhere."  *Id*. (Count I) ¶ 8, (Count II) ¶ 2.  Numerous overt acts relating to each conspiracy are also alleged in each count.  All of the overt acts alleged and subsequent substantive counts (Counts III-XX) are said to have occurred within the January 21, 2004 – August 5, 2004 time-span.

On July 15, 2005, after a trial of over three months, the jury in this case returned its verdict as to all Defendants.  Defendant Miquel Morrow was convicted of Counts I, II, III, IV, VII, VIII, X, XI, XII, XV, XVI, XVII, and XIX; however, Defendant Morrow was acquitted on Count XVII, which charged him with assault with intent to kill Edwin Arrington on or about April 23, 2004.  *See* Morrow Verdict Form at 1-9.  Defendant Lionel Stoddard was convicted of Counts I, II, X, XI, and XIV; however, like Defendant Morrow, Defendant Stoddard was also acquitted on Count XVII, which charged him with assault with intent to kill Edwin Arrington on or about April 23, 2004.  *See* Stoddard Verdict Form at 1-4.  Defendant Carlos Aguiar was convicted of all counts for which he

4

was charged – Counts I, II, III, IV, V, X, XI, XIII, and XX.  *See* Aguiar Verdict Form at 1-6.

Defendant Bryan Burwell was also convicted of all counts for which he was charged – Counts I, II,

X, and XI.  *See* Burwell Verdict Form at 1-3.  Likewise, Defendant Perkins was convicted of all

counts for which he was charged – Counts I, II, XV, and XVI.  *See* Perkins Verdict Form at 1-3.

Finally, Defendant Malvin Palmer was also convicted of all counts for which he was charged –

Counts I, II, III, IV, VI, VII, VIII, and IX.  *See* Palmer Verdict Form at 1-5.

B.      *Defendants' Motions for a New Trial*

Upon announcement of the verdicts on July 15, 2005, Defendants made various oral motions

for a new trial, reaffirming their intentions in a July 19, 2005 teleconference held on the record with

the Court.  *See United States v. Morrow*, Crim. No. 04-355 (D.D.C. July 19, 2005) (Scheduling

Order).  Through a series of new trial motions filed in the Fall of 2005, Defendants contended that

(1) the Government wrongfully withheld impeachment material from the defense during the trial, in

violation of the strictures described in *Brady v. Maryland*, 373 U.S. 83, 83 S.Ct. 1194, 10 L.Ed.2d

215 (1963); and (2) significant juror misconduct occurred when prejudicial, extraneous information

was introduced into the jurors' deliberations in this case.  In order to create a more fulsome record

regarding Defendants' allegations of juror misconduct, the Court held an evidentiary hearing on

October 31, 2005 during which it conducted an investigation within the parameters of Federal Rule

of Evidence 606(b).  At this evidentiary hearing, the Court questioned Juror #1 – the sole juror

relied upon as the basis of Defendants' assertions – as to possible extraneous influences upon the

jury, and then allowed both the Government and counsel for Defendants to conduct a limited inquiry

as well.  Following the completion of briefing, the Court denied Defendants' various motions for a

new trial on February 1, 2006, and set out sentencing dates for each of the six Defendants.  *See*

*United States v. Morrow*, 412 F. Supp. 2d 146 (D.D.C. 2006).

5

Defendant Miquel Morrow was scheduled to be the first Defendant sentenced, with a sentencing date set for Tuesday, April 11, 2006.  On April 7, 2006, four days prior to his scheduled sentencing, Defendant Morrow filed the present motion, entitled "Motion to Reopen Defendant Morrow's Motion for New Trial, or, in the Alternative, Motion for New Trial on Newly Discovered Evidence" (hereinafter, "Second Motion for a New Trial").  Defendant Morrow's Second Motion for a New Trial revolves around the fact that "[t]ragically, the foreperson of the jury herein Juror #2 . . . was murdered by her ex-boyfriend Jerrold E. Vincent on February 17, 2006."  *See* Defs.' Second Mot. for New Trial at 1, ¶ 1.  Defendant Morrow claims that records from the D.C. Jail verify that Mr. Vincent was incarcerated at the D.C. Jail during roughly the same time that Defendants in this case were also held at the D.C. Jail.  *Id.* at 1, ¶ 2.  According to Defendant Morrow, "[t]he records reveal[] that Juror #2 . . . was the 'common law wife' of Mr. Vincent and that [Juror #2] visited Mr. Vincent in the jail eleven (11) times from May 28th through July 17th 2005, during the last stages of [Defendants'] trial [in this case], including final arguments, deliberations and the reaching and delivery of the verdict."  *Id.*[6]

While not alleging any improper connection between Juror #2 or Mr. Vincent and Defendants in this case, Defendant Morrow notes that a review of the D.C. Superior Court charging documents of Mr. Vincent indicate that his relationship with Juror #2 lasted from February 2005 through October 2005, while *voir dire* in this case commenced on April 5, 2005.  *Id.* at 1, ¶ 3.  On April 5, 2005, Juror #2, along with other potential jurors, was asked during *voir dire* whether any of

---

[6] Defendants are correct that D.C. Jail records indicate that Juror #2 visited Mr. Vincent 11 times while this trial was ongoing.  *See* Defs.' Second Mot. for New Trial, Ex. B (D.C. Jail Records of the Visitation of Juror #2 & Incarceration History of Mr. Vincent) at 2.  Juror #2 visited Mr. Vincent a total of 15 times during his incarceration, with 4 of these visits coming after this trial had ended.  *See id.*  Juror #2's first visit took place on May 28, 2005, while her last visit took place on August 6, 2005 – nearly one month after the trial in this case had ended.  *See id.*

her immediate family or close friends had "been arrested, charged with a crime or found guilty or gone to jail for the same or similar type of crime as the ones charged in this case," a category that the Court noted "certainly should include any kind of robbery case, any kind of gun charges or assaults or anything else." *See* 4/5/05 Tr. at 46. If the potential juror answered "yes," the Court instructed "then you need to put '23' on your card." *Id*. Juror #2 (originally assigned #0769) only responded to #19, #20, #21, and #37 on her card; she did not write either #23 or #24. *Id*. at 142-43. According to Defendant Morrow, "D.C. Jail records reveal that Juror #2's 'common law' husband had served significant periods of incarceration at the Central Detention Center in 1994, 1997[, and] 2005." Defs.' Second Mot. for New Trial at 2, ¶ 6. Defendant Morrow contends that "[r]ecords further reveal that at least one of these periods of incarceration involved charges of assaultive conduct." *Id*. at 2, ¶ 7. Defendants now contend that Juror #2, by failing to identify the fact that she was in a relationship with someone charged with assaultive conduct, lied or omitted important information in the *voir dire* process in this case, causing them prejudice and requiring a new trial. *Id*. at 2-3. According to Defendants,

> [t]he conduct of Juror #2 in failing to reveal her close relationship to a person convicted of assaults, regularly visiting the DC Jail during the final weeks of the trial and during jury deliberations without disclosing this to the Court and her near hysteria during the reading of the verdict,[7] all militate a careful review of the fairness of the trial in light of this new information.

*Id*. at 2.

---

[7] Juror #2, as the foreperson, was required to read the jury's verdict during its announcement on July 15, 2005. Following the lengthy, three-to-four month long trial in this case, which involved six young Defendants charged with serious crimes and facing possible lengthy sentences, Juror #2 was emotional – though certainly not hysterical – during her reading of the verdict. At times, Juror #2 wept as she read out loud from the various verdict forms, and took brief breaks on the record to compose herself. Several other jurors were also teary-eyed. Following the announcement of the verdict, at the request of Defendants' counsel, the Court conducted a poll of each juror. During this poll, each juror indicated orally agreement with the verdict which had been rendered.

According to the D.C. Pre-Trial Services Agency ("PSA") report filed at the time of Mr. Vincent's arrest in February 2006 for Juror #2's murder, Mr. Vincent had the following convictions: (1) attempt threats (three counts) and destruction of property (domestic) (case number 2002CMD008504);[8] (2) unlawful entry and theft in the 2nd degree (1997); (3) shoplifting (1994); (4) petit larceny and possession of controlled substances (2001); (5) theft (1997); (6) concealment (1994); (7) larceny (1998); and (8) theft (1990).  *See* Gov't's Opp'n, Ex. 1 (Mr. Vincent's PSA Report, dated 2/20/06).  Mr. Vincent also has arrests without known dispositions for numerous offenses in Maryland, including theft (20 times), assault (twice, once in 1997 and once in 1999), trespassing (one time), violation of probation (one time), and failure to appear (two times).  *Id.*

The "assaultive conduct" referred to by Defendant Morrow, *see* Defs.' Second Mot. for New Trial at 2, ¶ 7, allegedly took place in August 2002, *see id.*, Ex. E (conviction details for 2002 conviction).  The complainant in that matter – case number 2002CMD008504 – was a woman named Pamela Pearson, not Juror #2.  *See* Gov't's Opp'n, Ex. 1 (Mr. Vincent's PSA Report, dated 2/20/06).  Mr. Vincent was charged with, and pled guilty to, three counts of attempt threats (domestic violence) and one count of destruction of property (domestic) in 2002 arising out of that incident.[9]  When Mr. Vincent was incarcerated during a portion of Defendants' trial, it was not on an "assault" charge.  Rather, Mr. Vincent was detained on May 13, 2005, following an arrest on a Bail Reform Act ("BRA") charge, case number 2005FEL002731, for his failure to appear for sentencing

---

[8] According to the Government, the PSA lists these as felony charges, but the case number and the RCIS database printout suggest this was a misdemeanor domestic case.

[9] According to the Government, the allegation of destruction of property in 2002CMD008504 comes from the fact that Ms. Pearson alleged that Mr. Vincent broke a car window during their domestic argument.  *See* Gov't's Opp'n, Ex. 1 (Mr. Vincent's PSA Report, dated 2/20/06).

in the misdemeanor attempt threats and destruction of property case, 2002CMD008504.  *Id.*  Upon

his detention on May 13, 2005, Mr. Vincent was sentenced on the charges involving Ms. Pearson on

May 27, 2005, and given a period of incarceration of approximately 120 days.[10]

    C.    *Additional Background Information*

       Following the completion of briefing on Defendants' Second Motion for a New Trial,

Defendant Morrow provided further background information regarding the relationship between

Juror #2 and Mr. Vincent on April 24, 2006, in a filing identified as "Supplemental Affidavit to

Defendant Morrow's Reply."  Mr. Dale Vaughn, Defendant Morrow's investigator, avers in his

affidavit that he conducted a conversation on April 21, 2006 with Juror #2's mother at her

residence.  *See* Def. Morrow's Suppl. Aff., Ex. 1 (Vaughn Aff.) at 1.  According to Mr. Vaughn,

Juror #2's mother stated that:

> Her daughter, [Juror #2], and Jerrold E. Vincent[] have known each other since
> childhood.  The [family of Juror #2] and [the] Vincent famil[y] lived a half block
> from one and other [sic] in the River Terrace section of the city, were friendly, and
> their children all went to school together.

> Approximately one week before Thanksgiving Day in 2004, [Juror #2] stated to her
> mother that she ran into Jerrold Vincent and invited him to their home for
> Thanksgiving Day dinner.  From November 25, 2004, until October 2005, [Juror
> #2] had a relationship with Jerrold Vincent.  After terminating this relationship[,]
> [Juror #2] obtained a restraining order against Mr. Vincent due to stalking and
> harassment.  The witness [i.e., Juror #2's mother] believes the order was still in
> effect at the time of her daughter's death in February of 2006.

> In regard to Mr. Vincent's past criminal history[,] [d]ue to the relationship between
> the two families, [Juror #2's mother] knows that her daughter was aware that Mr.
> Vincent had been in trouble in the past, and arrested numerous times.  After meeting
> Mr. Vincent in November of 2004, [Juror #2] acknowledged that she knew he had
> been recently released from jail.

---

[10] Mr. Vincent was released on August 12, 2005.  *See* Defs.' Second Mot. for New Trial,
Ex. B (D.C. Jail Records of the Visitation of Juror #2 & Incarceration History of Mr. Vincent) at 1.

*Id.*[11]

At the time of this trial, Juror #2 was 43 years old, and lived at 1313 D Street, N.E.,

Washington, D.C. 20002.  *See* Defs.' Second Mot. for New Trial, Ex. B (D.C. Jail Records of the

Visitation of Juror #2 & Incarceration History of Mr. Vincent).  Juror #2 was born on April 26,

1962.  *See id.*  Given that the River Terrace area of Washington, D.C. is across the Anacostia River

from both the majority of the District of Columbia and Juror #2's D Street address, it is clear that,

prior to the trial in this case, she had moved out of the childhood neighborhood in which she grew up

with Mr. Vincent.  Mr. Vincent was approximately 46 years old at the time of this trial, having been

born on May 10, 1959.  *See id.*, Ex. C (Gerstein Proffer for Murder of Juror #2 by Jerrold Vincent).

Police records relating to Mr. Vincent's subsequent arrest in February 2006 for the murder of Juror

#2 indicate that Mr. Vincent had a home in Laurel, Maryland, and another possible residence at

Kenilworth Avenue and 42nd Street, N.E., which is in the River Terrace area, across the Anacostia

River from where Juror #2 resided.[12]

## II: DISCUSSION

Rule 33 of the Federal Rules of Criminal Procedure provides, in relevant part, that:  "Upon

the defendant's motion, the court may vacate any judgment and grant a new trial if the interest of

justice so requires."  Fed. R. Crim. P. 33(a).  The granting or denial of a motion for a new trial is

---

[11] Given this information from Juror #2's mother, who would likely be the best available source regarding the relevant timeline and the scope of the relationship between Juror #2 and Mr. Vincent, there appears little to be gained from a further evidentiary hearing.  Defendants' request for a hearing or additional time for an investigation is undermined both by the untimeliness of their claim, discussed *infra*, and the fact that they do not indicate what additional evidence would be brought out by such a hearing or extension.

[12] Virtually all of Mr. Vincent's arrests occurred in Maryland, perhaps indicating that he spent the majority of his time in that state.  *See* Gov't's Opp'n, Ex. 1 (Mr. Vincent's PSA Report, dated 2/20/06).

committed to the sound discretion of the trial court judge, and is reviewed only for abuse of discretion. *United States v. Kelly*, 790 F.2d 130, 133 (D.C. Cir. 1986); *United States v. Mangieri*, 694 F.2d 1270, 1285 (D.C. Cir. 1982). Upon review, Defendants' Second Motion for a New Trial fails for three reasons.

    A.    *Defendants' Motion is Untimely*

Importantly, Defendants' Second Motion for New Trial falls outside of the strict time limits for a new trial motion set out by the Federal Rules of Criminal Procedure. Federal Rule of Criminal Procedure 33 sets out the general rule that "[a]ny motion for a new trial grounded on any reason other than newly discovered evidence must be filed within 7 days after the verdict or finding of guilty." *See* Fed. R. Crim. P. 33(b)(2). However, "there is nothing to prevent the court from granting the defendant a significant extension of time, so long as it does so within the seven-day period." Fed. R. Crim. P. 33 advisory commitee's note (2005). Here, Defendants' first series of new trial motions, filed throughout the Fall of 2005 and resolved by the Court on February 1, 2006, were timely because Defendants requested an extension to file them on both July 15 and July 19, 2005 – within the seven-day period following their trial. Defendants' current motion, their Second Motion for New Trial, is certainly outside of the time limits contemplated by Rule 33(b)(2), given that (1) it was outside of Defendants' first set of new trial motions, for which an extension was granted and an opinion issued, and (2) it was filed four days before Defendant Morrow was to be sentenced without the consent of either the Government or the Court. "The seven day time constraint imposed by Rule 33 constitutes a jurisdictional limit on a district court's power to grant a new trial." *United States v. Sanchez*, 917 F. Supp. 29, 33 (D.D.C. 1996) (citing *United States v. Hall*, 854 F.2d 1269, 1271 (11th Ci. 1988); *United States v. Brown*, 587 F.2d 187, 189 (5th Cir. 1979); 3 Charles A. Wright, Federal Practice and Procedure: Criminal §§ 552, 558 n.1

(2d ed. 1982)).  "Consequently, if [a] defendant file[s] his motion more than seven days after the

jury verdict, th[e] court does not have jurisdiction to hear [the] defendant's claim."  *Id.*

Given that Defendants clearly fall outside of the seven-day constraint imposed by Rule

33(b)(2), Defendants must rely instead on the "newly discovered evidence" provision of Rule

33(b)(1) as the basis for their new motion.  Rule 33(b)(1) provides:

> Any motion for a new trial grounded on newly discovered evidence must be filed
> within 3 years after the verdict or finding of guilty.  If an appeal is pending, the court
> may not grant a motion for a new trial until the appellate court remands the case.

Fed. R. Crim. P. 33(b)(1).  The following conditions must be met for a new trial motion based on

"newly discovered evidence":

> (1) the evidence must have been discovered since the trial; (2) the party seeking the
> new trial must show diligence in the attempt to procure the newly discovered
> evidence; (3) the evidence relied on must not be merely cumulative or impeaching;
> (4) it must be material to the issues involved; and (5) of such nature that in a new
> trial it would probably produce an acquittal.

*United States v. Lafayette*, 983 F.2d 1102, 1105 (D.C. Cir. 1993) (citations omitted).  A new trial

may also be granted when a government witness delivers false testimony, and the court is reasonably

well-satisfied that without the testimony, the jury might have reached a different conclusion if the

witness's false testimony is not discovered until after the conclusion of the trial.  *See Mangieri*, 694

F.2d at 1286 (citation omitted).

Here, Defendants do not suggest – nor can they accurately maintain – that the "evidence" at

issue in their Second Motion for a New Trial is "of such nature that in a new trial it would probably

produce an acquittal."  Rather, without explaining how, Defendants simply assert that Juror #2's

relationship with an individual convicted of what they claim was assaultive conduct – which was

limited to threats against another woman and destruction of property – would somehow cause her to

be biased against them.  *See* Defs.' Second Mot. for New Trial at 2.  Such evidence, even if true, is

12

completely unconnected with the underlying crimes, the evidence against Defendants, or Defendants themselves:  it goes only to an allegation of juror bias rather than Defendants' actual guilt or innocence as to the charges at issue in this case.  As such, even if true, Defendants' allegations would be insufficient to constitute the kind of "newly discovered evidence" that would warrant a new trial.  *See United States v. Hanoum*, 33 F.3d 1128, 1130 (9th Cir. 1994), *cert. denied*, 514 U.S. 1068, 115 S.Ct. 1702, 131 L.Ed.2d 564 (1995) ("a Rule 33 motion based upon 'newly discovered evidence' is limited to whether the newly discovered evidence refers to the elements of the crime charged"); *see also United States v. Allen*, 29 Fed. Appx. 471, 471-72 (9th Cir. 2002) (rejecting as untimely a defendant's "motion for a new trial on the asserted ground that a juror was prejudiced against him and should not have been allowed to serve" filed "[s]ix months after a jury verdict finding him guilty" because the motion "did not relate to the elements of the crime charged but rather to the conduct of the trial itself"); *Ida v. United States*, 207 F. Supp. 2d 171, 179-80 (S.D.N.Y. 2002) (rejecting claim that a juror misled the court during *voir dire* "both on the merits and, in the case of these eleventh hour contentions, on the grounds of timeliness").  Because Defendants' claim cannot meet the criteria to sustain a challenge under Rule 33(b)(1), Defendants' Second Motion for a New Trial properly falls within the umbrella of Rule 33(b)(2) and is therefore untimely.[13]

---

[13] Indeed, Defendants have no excuse for this untimely filing.  Defendant Stoddard, in his Supplemental Motion in Support of Defendants' Second Motion for a New Trial, represents that one day after his conviction in this case – i.e., on July 16, 2005 – he witnessed "a male inmate, later determined to be Jerrold Vincent" having a social visit in the D.C. Jail visitor's area with Juror #2. *See* Def. Stoddard's Suppl. Mot. at 1, ¶¶ 3-4.  As such, Defendants were on notice well within the time period set out in Federal Criminal Rule of Procedure 33 of Juror #2's possible connection to an inmate, but failed to include this matter in their first set of Motions for a New Trial covered in this Court's previous opinion, *United States v. Morrow*, 412 F. Supp. 2d 146 (D.D.C. 2006).

**B.** *Defendants Have Proffered No Evidence Indicating that Juror #2 Actually Failed to Disclose Information*

Even considering the merits of Defendants' Second Motion for a New Trial, assuming *arguendo* that Defendants' Second Motion for a New Trial was timely, three considerations undermine Defendants' claim vis-á-vis Juror #2.

1.   The Evidence is Somewhat Unclear Regarding Whether Mr. Vincent Was an Immediate Family Member or Close Friend on April 5, 2005 – the Date of *Voir Dire*

Defendants' motion is predicated upon an assumption that Juror #2 failed to disclose a close, personal relationship with Mr. Vincent – i.e., presumably an individual who was *"an immediate family [member] or close friend[]"* charged with "the same or similar type of crime as the ones charged in this case." *See* 4/5/05 Tr. at 46.  Here, Juror #2 was questioned during the *voir dire* process on April 5, 2005.  At that time, she had been – according to Defendant Morrow's claim – dating Mr. Vincent for, at most, two to four months.[14]  Her questioning on April 5, 2005 was prior to any of her visits to the D.C. Jail to see Mr. Vincent, as these visits commenced on May 28, 2005, as Mr. Vincent was not detained until May 13, 2005.  *See* Defs.' Second Mot. for New Trial, Ex. B (D.C. Jail Records of the Visitation of Juror #2 & Incarceration History of Mr. Vincent).

---

[14] This timeline is derived from the Gerstein Proffer for Murder of Juror #2 by Jerrold Vincent provided by Defendant Morrow.  *See* Def. Morrow's Second Mot. for New Trial, Ex. C (Gerstein Proffer for Murder of Juror #2 by Jerrold Vincent).  This proffer, from the Office of the United States Attorney, states that relatives of Juror #2 "advised it was approximately one year ago [from February 17, 2006, the date of Juror #2's murder] that the decedent and Jerrold Vincent began a relationship that ended in October 2005."  *Id.* at 1.  According to the Vaughn Affidavit, Juror #2's mother noted that Juror #2 had a "relationship with Jerrold Vincent" "[f]rom November 25, 2004, until October 2005."  *See* Def. Morrow's Suppl. Aff., Ex. 1 (Vaughn Aff.) at 1.  While it is unclear what type of "relationship" Juror #2 and Mr. Vincent had between November 25, 2004 and February 2005, the evidence shows that they were not dating any earlier than November 25, 2004.

Defendants spend most of their time arguing that Mr. Vincent was actually an "immediate family member" of Juror #2's as of April 5, 2005, contending that he was her "common-law husband" and therefore fell within the scope of *voir dire* Question #23.  Defendants arrive at the conclusion that Mr. Vincent and Juror #2 were "common law husband and wife" based upon a computer printout of records from the D.C. Jail which lists Juror #2 as a visitor to Mr. Vincent on May 28, 2005 (almost two months after *voir dire* in this case) and describes her as Vincent's "non-legal common-law wife."  *See* Defs.' Second Mot. for New Trial, Ex. B (D.C. Jail Records of the Visitation of Juror #2 & Incarceration History of Mr. Vincent) at 1.[15]  This printout, combined with (1) the statement by relatives of Juror #2 in police records relating to her subsequent murder that Juror #2 and Mr. Vincent "had 'grown up' in the River Terrace area of Northeast, Washington, D.C." with each other, *see* Def. Morrow's Second Mot. for New Trial, Ex. C (Gerstein Proffer for Murder of Juror #2 by Jerrold Vincent) at 1, and (2) the statement given by Juror #2's mother to Investigator Vaughn indicating that Juror #2's family lived near and was friendly with Mr. Vincent's family, *see* Def. Morrow's Suppl. Aff., Ex. 1 (Vaughn Aff.) at 1, represents the entirety of the evidence offered by Defendants to establish that Mr. Vincent and Juror #2 were more than simply casual friends on April 5, 2005.

> a.   *Problems With the Computer Printout from the D.C. Jail Undermine Defendants' Claim that Mr. Vincent Was Juror #2's Common Law Husband at the Time of the Voir Dire and Therefore a Member of Her Family*

Four problems exist with Defendants' assumption that because this computer printout identifies Mr. Vincent and Juror #2 as being in a "non-legal common-law" relationship, Juror #2

---

[15] The Court notes that, as a general matter, there is nothing inherently wrong with a person visiting a friend who is incarcerated during a period that the person is also fulfilling her obligations as a juror, nor is there some responsibility on the part of that juror to inform the Court of such visits.

was in a relationship with Mr. Vincent at the time of *voir dire* sufficient to trigger an obligation to

respond to the Court's inquiry during *voir dire*.

First, from the printout alone, it is not clear who entered this information into the D.C. Jail

records – i.e., whether Juror #2 held herself out as Mr. Vincent's "non-legal common-law wife" to

the D.C. Jail official who entered the computerized information, or whether the official instead

crafted the label with no input from visiting Juror #2.[16]

Second, while the District of Columbia does recognize "common law" relationships, it does

not recognize "*non-legal*" common-law relationships.  Indeed, such a designation would be quite

strange in this instance:  according to Defendants, Juror #2 had been dating Mr. Vincent roughly two

months at this point, making any "common-law" husband-wife claim bold and premature under

typical circumstances.  Such a label for the "relationship" between Juror #2 and Mr. Vincent also

appears illogical considering the fact that, by Defendants' admission, the relationship between Juror

#2 and Mr. Vincent lasted only eight to ten months, and Mr. Vincent was incarcerated for a

substantial portion of that time.

Third, all other evidence before the Court refutes the assertion that Juror #2 and Ms. Vincent

were ever "common law" husband and wife.  For instance, on the February 20, 2006 PSA Report

relating to Mr. Vincent's murder charge, Mr. Vincent's marital status is listed as "Single."  *See*

Gov't's Opp'n, Ex. 1 (Mr. Vincent's PSA Report, dated 2/20/06).  Other records of that arrest

indicate that Mr. Vincent had a home in Laurel, Maryland, and another possible residence at

Kenilworth Avenue and 42nd Street, N.E., where one of his arrests occurred.  When detained on

---

[16] Given this uncertainty, Defendant Perkins' confident assertion that "D.C. Jail records however show that [Juror #2] as early as May 28, 2005 considered herself Mr. Vincent's common-law wife" is without foundation.  *See* Def. Perkins' Reply at 1.

May 13, 2005 on the BRA charge and the 2002 domestic charges, Mr. Vincent did not identify

Juror #2 as a relative, nor did he give her address as his residence.  Simply, Defendants have not

produced any record that demonstrates that Mr. Vincent and Juror #2 ever actually co-habitated at

any point, let alone were "common law" husband and wife.

Fourth, and perhaps most importantly, even assuming the accuracy of Defendants'

contention that Mr. Vincent and Juror #2 were "non-legal common-law" husband and wife as of

May 28, 2005, Defendants have produced no evidence that their relationship had reached this level

by April 5, 2005 – the time of the *voir dire* in this case.  As such, Defendants cannot show that Juror

#2 omitted any information relating to an "immediate family member" during the *voir dire* process.

Moreover, some of the questions asked during *voir dire* required a sitting juror to bring certain

matters to the Court's attention if the juror later discovered that their answer during *voir dire* was

incomplete or later proven incorrect.  For example, while a juror might not have recognized/known

any individual involved with the case during *voir dire*, he or she may have later discovered that they

actually knew a witness upon viewing that witness in court; in that case, they were required to bring

the knowledge/relationship to the Court's attention.  However, the Court did not require jurors to

provide updates with respect to what had been Question #23 – i.e., whether any of immediate family

or close friends had "been arrested, charged with a crime or found guilty or gone to jail for the same

or similar type of crime as the ones charged in this case," which would "include any kind of robbery

case, any kind of gun charges or assaults or anything else."  *See* 4/5/05 Tr. at 46.  Accordingly, even

assuming (1) Juror #2's relationship with Mr. Vincent later reached the level of "family" at some

point after the *voir dire* in this case, (2) that Juror #2 actually became aware of Mr. Vincent's

criminal history, and (3) Mr. Vincent's criminal history actually fell under the Court's question,

Juror #2 was still not required to bring this information to the Court's attention.

> b.      *Other Evidence*

However, *voir dire* Question #23 was not cabined to immediate family members alone; rather, the Court also required that potential jurors reveal applicable information relating to "close friends."  *See* 4/5/06 Tr. at 46.  Here, two pieces of evidence suggest that Juror #2 and Mr. Vincent were more likely "close friends" as of the date of the *voir dire* on April 5, 2005.  First, according to the statement made by relatives of Juror #2 in police records relating to her subsequent murder, (1) Juror #2 and Mr. Vincent "had 'grown up' in the River Terrace area of Northeast, Washington, D.C." with each other, and (2) Juror #2 and Mr. Vincent began a "relationship" in or around February 2005.  *See* Def. Morrow's Second Mot. for New Trial, Ex. C (Gerstein Proffer for Murder of Juror #2 by Jerrold Vincent) at 1.  Second, according to Juror #2's mother, (1) the two families lived in close proximity with each other; (2) the children from both Mr. Vincent's family and Juror #2's family attended school together; (3) Juror #2 was sufficiently close to Mr. Vincent that she invited him for Thanksgiving dinner in November 2004; and (4) Juror #2 had "a relationship with Jerrold Vincent" "[f]rom November 25, 2004, until October 2005."  *See* Def. Morrow's Suppl. Aff., Ex. 1 (Vaughn Aff.) at 1.

These facts, while not definitive, strongly suggest that Juror #2 was more than a casual acquaintance of Mr. Vincent by the date of the *voir dire* in this case.  As such, because the evidence arguably suggests that Juror #2 was close friends with Mr. Vincent on or before April 5, 2005, Juror #2 would have been required to answer Question #23 in the affirmative – which she did not – as long as (1) Mr. Vincent's criminal convictions fell within the parameters of the Court's question and (2) Juror #2 was aware of the precise nature of those convictions.  At this point, having succeeded in establishing that Juror #2 and Mr. Vincent were arguably close friends, Defendants' motion begins to encounter certain obstacles.

2.      It is Somewhat Arguable Whether Mr. Vincent's Crimes (as of April 5, 2005) Necessarily Fell Within the Court's *Voir Dire* Questions

The first possible factual error made by Defendants in their Second Motion for New Trial is the assumption that Mr. Vincent's crimes fell within the parameters of the Court's *voir dire* question – Question #23.  Potential jurors were asked by this Court in *voir dire* Question #23 whether they had any immediate family or close friends who had "been arrested, charged with a crime or found guilty or gone to jail for *the same or similar type of crime as the ones charged in this case*," which could "include any kind of robbery case, any kind of gun charges or assaults or anything else."  *See* 4/5/05 Tr. at 46 (emphasis added).  Prior to Question #23, the Court had summarized the basic charges and alleged facts in this case for the veniremen, reading from an agreed-upon statement crafted with significant input from both the Government and Defendants prior to trial.  *See id.* at 16:4-26:19.  For example, the Court noted that:

> Mr. Morrow is charged with conspiracy to participate in a racketeer influenced corporation, conspiracy to commit armed bank robbery, four counts of armed bank robbery, four counts of using and carrying a firearm during a crime of violence, two counts of unlawful possession of a firearm by a person convicted of a crime punishable by imprisonment for a term exceeding one year in an aiding and abetting capacity and two counts of assault with intent to kill while armed.

*Id.* at 16:10-17.  The Court then detailed the Defendants' alleged crimes, noting, for instance, that:

> Defendants Morrow and Stoddard are charged with shooting a man named Edwin Arrington and a bystander, Bonita Cobb[,] near the 900 block of Longfellow Street, Northwest in the District of Columbia on April 23, 2004.  Neither victim died as a result of the injuries.

*Id.* at 24:6-10.

The three important points should be considered.  First, Mr. Vincent was not incarcerated at the time of *voir dire* questioning on April 5, 2005 or thereafter on a physical assault crime or a crime similar to the crimes charged in this case – i.e., bank robbery or assault with intent to kill involving

19

individuals chasing a man down a street while shooting at him with guns.  *See* Gov't's Opp'n, Ex. 1 (Mr. Vincent's PSA Report, dated 2/20/06).

Second, virtually all of Mr. Vincent's known convictions prior to this trial involved theft, larceny, or probation violations.  *See id.*[17]  Indeed, as of April 5, 2005, there was nothing within his known, largely non-violent criminal history of the nature of the crimes in this case.  Rather, based upon the present record, the only conduct even approaching criminal assault for which Mr. Vincent had been <u>charged and convicted</u> of by the time of *voir dire* in this case were the three counts of attempt *threats* (domestic violence) and one count of destruction of property (domestic) in 2002 arising out of an incident with another woman – conduct quite dissimilar to the alleged conduct at issue in this case; unlike a commonly understood assault, Mr. Vincent was neither charged nor convicted of actual physical touching or use of a weapon.  *See id.*

Third, Mr. Vincent's PSA report lists three Maryland arrests (out of a total of 23 Maryland arrests) that represent possible assaults:  (1) a January 6, 1988 charge of "battery, theft" in Landover, Maryland; (2) a February 27, 1997 charge of "assault, theft, violation of probation" in Millersville, Maryland; and (3) a June 22, 1999 charge of "assault–2nd Degree" in Upper Marlboro, Maryland.  *See id.* at 6.  There is no evidence in the record regarding ultimate outcome of these charges, nor is there any evidence to suggest that Juror #2 was either in contact with Mr. Vincent during these years or aware of these charges, which took place 6-17 years before this trial.

Upon a consideration of these facts, it is clear that, to the extent that Question #23 asked prospective jurors whether they were a close friend or immediate family member of an individual convicted of a crime similar to the crimes at issue in Defendants' case, it is arguable that Mr.

---

[17] Mr. Vincent's PSA Report indicates 23 arrests in Maryland without the complete disposition listed.  *See* Gov't's Opp'n, Ex. 1 (Mr. Vincent's PSA Report, dated 2/20/06) at 6.

Vincent's known convictions would not have required a positive response to the Court's *voir dire* question on the part of Juror #2.  *See United States v. White*, 116 F.3d 903, 930 (D.C. Cir. 1997) (given the context and wording of the relevant question, the court could not conclude that the juror had answered dishonestly during *voir dire*).  However, Question #23 was not simply limited to convictions; rather, the Court directed its question at "any member of the group [i.e., close friends and immediate family] [who] had been arrested, charged with a crime or found guilty or gone to jail."  *See* 4/5/06 Tr. at 46:10-11.  Moreover, the Court set out certain crimes that it felt necessarily fell within "the same or similar type of crime as the ones charged in this case."  *Id.* at 46:11-12.  The Court noted that "similar" crimes included "any kind of robbery case, any kind of gun charges or assaults or anything else" that the prospective jurors deemed similar.  *Id.* at 46:5-7.  Even though the ultimate disposition of these charges is unclear, the present record does establish that Mr. Vincent was arrested three times in Maryland for assault, including one charge of 2nd degree assault.  *See* Gov't's Opp'n, Ex. 1 (Mr. Vincent's PSA Report, dated 2/20/06) at 6.  While the underlying conduct in these assault arrests might be based on conduct that did not fall under what a layperson might consider to be "assault," the Court considered *all* assault charges – regardless of the underlying conduct – as falling within the parameters of Question #23.  As such, assuming that Juror #2 was aware that Mr. Vincent had previously been arrested for assault (even though the conduct at issue might have been quite different from Defendants' conduct) and Juror #2 consciously recalled these out-dated incidents during *voir dire*, then Juror #2 should have answered Question #23 in the affirmative and brought the matter to the attention of both the Court and counsel.  However, it is this assumption of "knowledge" that fatally undermines Defendants' argument.

    3.      <u>No Evidence that Juror #2 Was Aware of Any Assaultive Conduct by Mr.</u>
<u>Vincent at the Time of *Voir Dire*</u>

The major, fatal factual error on the part of Defendants is their assumption that Juror #2 was aware of previous arrests, charges, or convictions of Mr. Vincent that could be considered "assaultive" or "similar to the crimes charged in this case" on April 5, 2005 – i.e., the date of *voir dire* in this case.  Importantly, there is simply no information in the record that would suggest that Juror #2 knew of the precise nature of any prior or present criminal history relating to Mr. Vincent.  As noted, Mr. Vincent was arrested in Maryland three times on assault charges:  once in 1988, once in 1997, and once in 1999.  *See id.*  These arrests, which are shown on Mr. Vincent's PSA Report as having unknown dispositions, (1) occurred approximately 5-16 years before Juror #2 ever entered a "relationship" with Mr. Vincent; (2) took place when Mr. Vincent was 29, 38, and 41 years old, respectively, well past the age when he and Juror #2 would have gone to school together, lived in the River Terrace area, and maintained regular social contact; and (3) happened in another state, Maryland, where there is no evidence in the record that Juror #2 ever resided.  Moreover, the 2002 domestic case (1) did not involve what a layperson might consider "assault"; rather, it involved only attempt threats and destruction of domestic property, wherein no one was actually injured; (2) did not involve Plaintiff; and (3) Mr. Vincent was not incarcerated for the conduct at issue until May 2005 – after *voir dire*.

Given the current record, it is not at all clear that Juror #2 knew of Mr. Vincent's criminal history, or its precise nature, by the time of the April 5, 2005 *voir dire* in this case, which was less than two to four months after their romantic relationship allegedly commenced.  The statement offered by Juror #2's mother highlights this uncertainty:  in her conversation with Investigator Vaughn, Juror #2's mother merely recounts that "her daughter was aware that Mr. Vincent had been

in trouble in the past and arrested numerous times.  After meeting Mr. Vincent in November of

2004, [Juror #2] acknowledged that she knew he had been recently released from jail."  *See* Def.

Morrow's Suppl. Aff., Ex. 1 (Vaughn Aff.) at 1.[18]  As such, despite being close with Mr. Vincent's

family and living in proximity to his boyhood residence, Juror #2's mother had – at best – a vague

understanding of Mr. Vincent's precise criminal history.  Indeed, given the age of Juror #2 (43 years

old) and Mr. Vincent (46 years old) at the time, and the fact that they lived apart in separate

neighborhoods at the approximate time of this trial, it is as likely as not that Juror #2 shared her

mother's vague understanding about Mr. Vincent's criminal past.

 Absent a showing (or causal connection) that Juror #2 was aware of an assault or other

crime committed by Mr. Vincent similar to the crimes at issue in this case <u>at the time of the *voir*</u>

<u>*dire*</u>, there is simply no basis for Defendants' claim that Juror #2 intentionally misled the Court by

omitting to respond in the affirmative to *voir dire* questions #23 or #24.  Mr. Vincent may well have

lied or concealed his criminal history during conversations with Juror #2, given a partial, incomplete

account of his history, or told her of his full history at some point following the April 5, 2005 *voir*

*dire*.  Given that (1) Juror #2 was under no obligation to inform the Court of this information if

discovered after *voir dire*, and (2) she may have never known the full and accurate extent of Mr.

Vincent's history, Defendants have not established that Juror #2 withheld information in a manner

that violated the letter and spirit of the Court's *voir dire* question.

---

[18] Records show that Mr. Vincent had been released from confinement on July 30, 2004, following an approximately two year incarceration for a parole violation in Arlington County, Virginia.  *See* Gov't's Opp'n, Ex. 1 (Mr. Vincent's PSA Report, dated 2/20/06) at 5.  This was the "recent release" from jail referred to by Juror #2's mother.  On June 1, 2001, Mr. Vincent was given a 2 year period of probation in Arlington County, Virginia, for "possession of controlled substances."  *Id.* at 4.  He obviously violated this probation on November 11, 2002, leading to his arrest that day and subsequent parole violation incarceration.  *Id.* at 5.

C.     *The Court's Voir Dire Questioning Was More Than Adequate to Root Out Relevant Information*

Defendant Morrow, in his Reply, raises a new argument for the first time, asserting without any citation to the record that "[i]n this case the manner in which the Voir Dire was conducted deprived the defendant of a fair trial."  Def. Morrow's Reply at 3.  According to Defendant Morrow, "[t]oo often the Court left to the discretion of the jurors the determination of whether they could be fair or if they were required to disclose facts.  The Court left it to the juror to determine who was a close friend or relative, or whether a relationship would affect their fairness and impartiality."  *Id.* Defendant Morrow now contends that the central failing of the Court's inquiry was its failure "to ask directly whether prospective jurors had been exposed to close friends or relatives convicted or accused of crime, instead, the judge conflated that question with the broader inquiry whether, notwithstanding their presumed exposure it would affect their ability to be fair and impartial."  *Id.* at 4.

In conducting *voir dire* under Federal Rule of Criminal Procedure 24(a), the trial judge "'is accorded broad discretion to mold the manner and mode of [the] examination,'" and there is "'no basis for reversal unless he abuses his discretion and there is substantial prejudice to the accused.'" *United States v. Edmond*, 52 F.3d 1080, 1095 (D.C. Cir. 1995) (per curium) (quoting *United States v. Liddy*, 509 F.2d 428, 435 (D.C. Cir. 1974)); *see also United States v. Orenuga*, 430 F.3d 1158, 1162 (D.C. Cir. 2005).  "Specific subjects for *voir dire* questioning are 'constitutionally compelled' when 'the trial court's failure to ask [a] question[] . . . render[s] the defendant's trial fundamentally unfair," but not where the subjects proposed for questioning may be merely "helpful."  *Orenuga*, 430 F.3d at 1163 (quoting *Mu'Min v. Virginia*, 500 U.S. 415, 425-26, 111 S.Ct. 1899, 114 L.Ed.2d 493 (1991)).  The defense always "must be given a full and fair

24

opportunity to expose bias or prejudice on the part of the veniremen," *United States v. Robinson*, 475 F.2d 376, 380-81 (D.C. Cir. 1973), and "'the restriction upon inquiries at the request of counsel [is] subject to the essential demands of fairness,'" *Morgan v. Illinois*, 504 U.S. 719, 730, 112 S.Ct. 2222, 119 L.Ed.2d 492 (1992) (quoting *Aldridge v. United States*, 283 U.S. 308, 310, 51 S.Ct. 470, 75 L.Ed. 1054 (1931)).

Multiple problems exist with Defendant Morrow's unfounded contention that the *voir dire* process in this trial was somehow flawed.  First, Defendant Morrow failed to object to any of the *voir dire* questions posed by the Court – a fact conveniently overlooked by Defendant Morrow in his current motion.  Moreover, the *voir dire* questions employed by the Court in this case flowed out of a joint iterative process between the Court and all defense counsel, wherein Defendants were given the opportunity to submit their own proposed *voir dire* questions which were then largely incorporated into the Court's inquiry.  As such, if Defendant Morrow had an issue with any of the Court's questions, including Question #23, Defendant Morrow was certainly provided with the opportunity to bring his concerns to the Court's attention, and he himself failed to suggest any modifications to this question.  Indeed, while the Court set out forty (40) *voir dire* questions – both broad and narrow – on April 5, 2005, *see* 4/5/05 Tr. at 21:13-59:1, the Court also allowed Defendants to supplement these questions with their own questioning, noting:

> Let me just mention that in terms of the questions I would ask, I will call on you after I've done an inquiry.  You know, I will go through what the questions are.  I'll do an inquiry about each of the questions.  I'll then call on you . . . . If I've asked the questions, I don't want to hear the same exact question.

*Id.* at 8:10-14.

Second, a review of the record indicates that the Court carefully structured the *voir dire* in order to guard against possible bias, incorporating a vast array of questions and consistently

stressing the need for complete and accurate answers that weighed in favor of disclosure whenever

uncertainty arose.  At the beginning of the process, the Court emphasized to the veniremen that "I'll

be asking you some questions which the lawyers and I think will be helpful to us in selecting a fair

and impartial jury.  And you, of course, are bound by the oath you've just taken to speak truthfully

in response to those questions."  *Id*. at 18:10-14.  The Court stressed the need for complete

disclosure, noting that "[t]he key part for you is to listen very carefully to the question.  If you're not

sure whether you have information or not, it's better to put it down.  We can talk about it."  *Id*. at

20:9-11.  Indeed, the Court left a final, "catchall" question "at the end" wherein potential jurors

could bring any other information that they deemed relevant to the Court and parties' attention.  *See*

*id*. at 20:16-22; *see also id*. at 57:23-58:1 ("So is there any reason you can think of, whether or not

it's been covered by a previous question, why you couldn't sit fairly attentively and impartially in

this case?  If there is something that falls in that category, put 39 on your card.").

      After an initial series of questions that addressed whether members of the venire knew or had

any contact with the Defendants, the attorneys in the case, witnesses, or relevant physical locations,

the Court then turned to a series of questions that dealt with the potential jurors' immediate family

and close friends.  *See id*. at 42.  The Court, without objection from any Defendant, then attempted

to define these terms in the most specific manner possible, carefully stressing the importance of

eliminating any source of possible prejudice to Defendants:

> Now, there's a number of questions here that are going to apply to each of you as
> jurors, to members of your immediate family and close friends.  I'm going to leave
> that definition to you what it is.  And the reason we're expanding it is it should be
> people that you're close to, that you see frequently, that you would have discussions
> with or you know things in their lives.  And the reason we expand it is because what
> they may have said to you about something or what may have happened to them,
> may be something you know and that might influence you.  So that's the purpose of
> expanding it.  Some people are close to certain relatives, not others.  I'm not going to
> know that.  You do.

> In terms of close friends, again, it's people you see frequently, people you listen to, you know what's happening in their life.

*Id*. at 42:13-43:2.  Throughout these series of questions, the Court frequently emphasized that members of the venire were required to reveal relationships and information that "would make it difficult for you to be fair and impartial as a juror in this case[.]"  *Id*. at 44:21-22.

The Court then asked two specific questions that applied to this situation – Questions #23 and #24.  *See id*. at 45:25-47:11.  Question #23 required potential jurors to reveal whether they, their close friends, or their immediate family had ever been a victim or witness of a crime similar to those charged, or whether any member of their close friends or immediate family had been charged with a crime similar to those at issue in this case.  *See id*. at 45:25-46:19.  Contrary to Defendant Morrow's unfounded contention, the Court did not "conflate" this question with whether they could be "fair and impartial"; rather, veniremen were required to answer "yes" or "no" to this question, regardless of whether or not they were prejudiced in any way as a result of this connection to "similar" crimes.  Specifically, the Court, in Question #23, asked:

> I want you to listen to this very carefully.  This, again, applies to yourself, members of your immediate family or close friends.  Member of that group been a victim or witness, and this is the same or similar type of crime as the crimes charged in this case?  You can decide what you think is similar, but it certainly should include any kind of robbery case, any kind of gun charges or assaults or anything else.  So that's generally same or similar.  If you or somebody close to you has been a victim or witness to those kinds of crimes, put 23 on your card.
>
> Or any member of the group been arrested, charged with a crime or found guilty or gone to jail for the same or similar type of crime as the ones charged in this case.  So it's any kind of broad robbery, bank robbery, gun charges, assaults, anything falling in that category.  So category – one of the categories are a victim or a witness.  The other category is arrested or charged.  And it doesn't matter what happened in terms of how it was ultimately resolved.  But if they've been arrested or charged, then you need to put 23 on your card.

*Id*.  In contrast, Question #24 explored potential partiality stemming from such a relationship to any

27

prior crime – whether similar or not.  There, the Court stated:

> All right.  24 is a little different,. so I want you to listen carefully to it.  This, again, applies to yourself, members of your immediate family, close friends.  Has any member of that group?  Again, the categories are victim or witness, and the category is arrested or convicted.  Now, this is any crime.  So it doesn't have to be – the earlier one was related to same or similar in a broad sort of sense.  This is if a witness or a victim were arrested or convicted, any crime, and that has affected you such that you would not be able to be fair and impartial in this case.
>
> So even a victim or a witness or someone been arrested or convicted of any crime, but you don't think it's going to affect your fairness and impartiality, then don't put anything down.  But if you've been a victim or a witness, arrested or convicted in the broader group, any crime, and you think that that would affect your fairness and impartiality in this case, then put 24 on your card.

*Id.* at 46:20-47:11.  Following this process, during which the Court asked all members of the venire the forty *voir dire* questions at the same time in the courtroom, each prospective juror was brought back separately to the conference room behind the courtroom, wherein individual questioning of that prospective juror occurred on the record with the Court, the Government, and defense counsel present.  At this point, Defendants were free to conduct individualized questioning of each prospective juror to the extent that they considered necessary.

Upon a review of the Court's *voir dire*, it is clear that the Court did not abuse its discretion in crafting the inquiry.  Instead, Defendants had a vital role in the iterative process leading up to the *voir dire*, suggesting potential questions and requesting certain modifications; Defendants also had an opportunity following *voir dire* to conduct individualized questioning on each prospective juror.  While Defendant Morrow now objects to that inquiry without any direct citation to the record or any particularized criticism, Defendant Morrow himself played an active role in the development of the *voir dire*, made no objections to the Court's inquiry, and was given an opportunity to supplement the Court's questioning – the Court in no way restricted his investigation into potential bias.  Moreover, a review of the actual questioning that occurred reveals that the Court was as specific as

28

possible to root out possible partiality flowing from a venireman's relationships, and constantly stressed the need for full disclosure.  Indeed, Question #23 (the question at issue in Defendants' Second Motion for New Trial) required a "yes" or "no" answer regardless of whether the potential juror felt that he or she could remain impartial.  Simply, the Court's inquiry fully comported with constitutional requirements, and provided a fulsome investigation into possible sources of bias.  Defendant Morrow has failed to sustain his charge that the inquiry was somehow "fundamentally unfair," especially given his active participation in and acceptance of the Court's *voir dire*.

> D.  *Even Assuming Arguendo that Juror #2 Did Fail to Disclose Information During Voir Dire, Defendants' Motion Fails to Satisfy the Necessary Standards*

Even assuming *arguendo* that Juror #2 did actually "fail to disclose information" during *voir dire*, Defendants cannot meet the strict standard necessary to establish the need for a new trial.  The D.C. Circuit has established the rule that:

> For reversal because of a juror's failure to disclose information at voir dire, the Supreme Court requires the complaining party to show that the juror "failed to answer honestly a material question on voir dire, and then further show that a correct response would have provided a valid basis for a challenge for cause.  The motives for concealing information may vary, but only those reasons that affect a juror's impartiality can truly be said to affect the fairness of a trial."

*United States v. Williams-Davis*, 90 F.3d 490, 503 (D.C. Cir. 1996) (quoting *McDonough Power Equip., Inc. v. Greenwood*, 464 U.S. 548, 556, 104 S.Ct. 845, 78 L.Ed.2d 663 (1984) (plurality)); *see also United States v. North*, 910 F.2d 843, 904 (D.C. Cir. 1990) ("Read along with the concurrences of five Justices, *McDonough* suggests that an aggrieved party must show that the juror's correct response at voir dire would have demonstrated actual bias.").  The Court of Appeals reviews the district court's determination for abuse of discretion.  *Id.* (citing *United States v. Boney*, 68 F.3d 497, 502 (D.C. Cir. 1995)).  Ultimately, "[a] trial court's findings of juror impartiality may

29

'be overturned only for 'manifest error.'" *Patton v. Yount*, 467 U.S. 1025, 1031, 104 S.Ct. 2885,

81 L.Ed.2d 847 (1984) (quoting *Irvin v. Dowd*, 366 U.S. 717, 723, 81 S.Ct. 1639, 6 L.Ed.2d 751

(1961)).

In this case, Defendants cannot demonstrate actual or implied bias on the part of Juror #2.  A

review of the record indicates that Juror #2, at the time of *voir dire* and during the time of

Defendants' trial, was not a victim of assault by Mr. Vincent, nor did she apparently harbor any

animosity toward him.  Rather, Juror #2 voluntarily visited Mr. Vincent on numerous occasions

after he was incarcerated, stretching from the beginning stages of this trial (May 2005) to well past

the announcement of the jury verdict (August 2005).  *See* Defs.' Second Mot. for New Trial, Ex. B

(D.C. Jail Records of the Visitation of Juror #2 & Incarceration History of Mr. Vincent).  Based

upon these facts, it is as likely that rather than being biased *against* Defendants in this case, Juror #2

would have actually been more favorably disposed towards Defendants than a neutral juror, as she

could have sympathized with their position and the possibility of a long incarceration where they

would be taken from their family, friends, and loved ones.

Indeed, an examination of the record adduced during the *voir dire* process supports the

likelihood that if any bias resulted from Juror #2's relationship with Mr. Vincent, the ensuring bias

would have been pro-Defendant.  Without providing any citation to the record, Defendant Morrow

contends that "[u]pon recollection and belief[,] another prospective juror interviewed was stricken

for cause due to her disclosure of a relative or friend at the DC Jail during the voir dire process."

Def. Morrow's Reply at 2.  Having reviewed the record, the Court has found two possible members

of the venire who fit Defendant Morrow's recollection.  The first, Prospective Juror #1609, noted

that her ex-husband, whom she married while he was in jail, is currently serving a lengthy sentence

for murder.  *See* 4/6/05 Tr. at 239:15-243:1.  This member of the venire also indicated that her ex-

husband "had a bad experience with the police department" as a result of this incarceration.  *Id.* at

240:2-13.  While these considerations were brought out, they were not a factor in Prospective Juror

#1609's ultimate excusal from the jury.  Rather, because she seemed to have misunderstood or not

heard several of the Court's *voir dire* questions, or been distracted by another juror when the

questions were read, both the Government and Defendants agreed that Prospective Juror #1609

should be excused from service.  *See id.* at 248:7-25.

The second, Prospective Juror #2083, noted that she regularly talked – on a daily basis – to

a friend in jail who had been convicted of the armed robbery (with a shotgun) of a restaurant.  *See*

4/11/05 Tr. at 965:24-970:25.  This prospective juror maintained that this relationship would not

bias her in reviewing the evidence.  *See id.* at 967:4-968:8.  The *Government* objected to her

presence on the jury, and moved to strike her for cause based on an argument that it was likely that

she would biased *in favor of Defendants*.  *See id.* at 971:6-22.  In contrast, Defendants defended her

objectivity and requested that she be placed on the jury, with Defendant Morrow's counsel

contending that "[j]ust because of that, it doesn't mean that she cannot be fair."  *Id.* at 972:3-6.  The

Court considered the arguments, and found that while the Government could use a peremptory

challenge against this individual, "I don't think this rises to a level of cause."  *Id.* at 972:8-10.  As

such, it is clear that (1) Defendants expected that a juror who had frequent contact with an

incarcerated person would actually be biased in favor of them; (2) the Government expected that

such an individual would be biased against its interest; and (3) the Court did not consider such a

background, without more, the basis for a valid challenge "for cause."  Accordingly, the recollection

of Defendant Morrow's counsel actually undermines his position.

Indeed, a review of the individualized questioning of Juror #2 (then Prospective Juror

#0769) reveals that it is highly unlikely that Juror #2's relationship with Mr. Vincent could have

created an extraneous influence upon her consideration of the evidence in this case.  *See* 4/5/06 Tr.

at 142:22-149:15.  The individualized questioning of Juror #2 by counsel and the Court in light of

the Court's previous *voir dire* questions revealed two relevant facts:  (1) Juror #2 had previously

served as a sergeant at arms on a grand jury, and a foreperson on a petit jury in D.C. Superior Court

in 2003 in a case dealing with charges relating to an armed rape and murder, *see id.* at 144:3-

146:22; and (2) Juror #2 was an avid fan of television programs such as *CSI*, *Law & Order*, and

*NYPD Blue*, *see id.* at 143:1-13.  When asked whether these interests and experiences would

influence her in any way, Juror #2 was clear that this situation was "totally different," that there is a

clear distinction because "[t]his is fact, and TV's fiction," and her previous juror service would not

impact her because this case is "[t]otally different."  *Id.* at 143:19-20, 144:1-2, 145:1-2.[19]

Perhaps realizing this weakness in their argument, Defendants avoid the strong possibility

suggested by the facts that Juror #2 was either neutral or biased *in favor* of them by instead relying

on an unfounded supposition full of conspiratorial overtones.  First, Defendant Morrow theorizes

that because Mr. Vincent "apparently was in the same unit with the defendants at the DC Jail," he

"could have been involved in hostile relations with them."  Def. Morrow's Reply at 2.  Three flaws

exist with this theory:  (1) Defendant Morrow has proffered no evidence suggesting that Mr. Vincent

ever came into contact with any Defendant, let alone developed potentially negative feelings towards

Defendants; (2) had Mr. Vincent actually come into contact with Defendants, it is equally likely that

---

[19] It is worth noting that Juror #1, whose numerous communications with defense counsel
and fulsome testimony at an October 31, 2005 evidentiary hearing raised a number of issues relating
to possible extraneous influences upon the jury and other amorphous concerns, provided no
indication that Juror #2 ever brought in any extraneous material from her personal life or other
considerations into her weighing of the evidence at hand in this case.  *See* 10/31/05 Tr.; *see also*
Def. Morrow's Reply to Court Order for Prod. of Juror-Witness Stmt., Ex. 1 (Emails from Juror #1
to defense counsel).

he could have developed positive feelings to them, and any influence he could have had on Juror #2 would then actually have benefited, rather than hindered, Defendants; and (3) even assuming that Mr. Vincent came into contact with Defendants and developed an antipathy towards them, Defendants still have failed to establish that Mr. Vincent ever relayed those feelings to Juror #2.[20] Absent any evidence or causal connection to substantiate his speculation, Defendant Morrow's conjecture is simply without support.

Second, Defendant Perkins hypothesizes that because "[t]he same U.S. Attorney's office that prosecuted Mr. Vincent's pending domestic violence case also prosecuted Mr. Perkins' case," Juror #2 "had an incentive to curry favor with the prosecutor who was prosecuting her common-law husband's case." Def. Perkins' Reply at 3. Multiple flaws also exist with this theory. First, the record is clear that Mr. Vincent was not detained until May 13, 2005 – over one month after the April 5, 2005 *voir dire* in this case. As such, Juror #2 would have possessed no incentive to lie or omit information "to curry favor with the prosecutor" at the time of *voir dire* because Mr. Vincent was not yet in jeopardy for that offense, and was instead free in the community. Second, when Mr. Vincent was locked up on May 13, 2005, his incarceration followed an arrest on a BRA charge, case number 2005FEL002731, for his failure to appear for *sentencing* in his 2002 misdemeanor domestic case. The 2005 BRA charge was "no papered" and Mr. Vincent was apparently held on the warrant in the domestic case. Importantly, Mr. Vincent had already pled guilty on October 2, 2002 in that domestic case to three counts of attempt threats and one count of destruction of

_____

[20] Indeed, given that Juror #2 is now deceased and Mr. Vincent incarcerated for her murder, the Court certainly cannot conduct a Rule 606(b) inquiry at this time of either individual to determine whether any "extraneous prejudicial information was improperly brought to" Juror #2's attention "or whether any outside influence was improperly brought to bear upon" Juror #2, nor would such an inquiry necessarily be warranted given the failings in Defendants' proffer. Fed. R. Evid. 606(b).

property.  *See* Def. Morrow's Second Mot. for New Trial, Ex. E (Conviction Details for 2002

Conviction) at 1.  Given that he had already pled guilty, this was not a case where the prosecutor

would have had the ability to somehow drop the charges against Mr. Vincent in return for Juror #2's

support in this case; rather, the matter was largely out of the prosecutor's hands and in the hands of

Judge Lynn Leibovitz of the District of Columbia Superior Court.[21]  Third, Mr. Vincent was

formally sentenced in the 2002 domestic case on May 27, 2005, and given a period of incarceration.

Given that Mr. Vincent was sentenced to a period of incarceration well in advance of the end of the

trial in this case (which culminated with the announcement of the jury's verdict on July 15, 2005),

(1) there would be no incentive for Juror #2 to continue any alleged "cooperation" with the U.S.

Attorney's Office, given that Mr. Vincent's sentence was already determined and had already

commenced, and (2) if anything, there would have been an incentive for Juror #2 to punish that very

U.S. Attorney's Office for incarcerating Mr. Vincent and removing him from the community by

casting a "not guilty" verdict in favor of Defendants.  Given these considerations and the lack of any

evidence to support Defendant Perkins' speculation, it is clear that his conjecture is simply without

merit.

Ultimately, Defendants have simply made no showing of bias resulting from Mr. Vincent's

situation that could have transferred to them which would be sufficient to support a strike for cause

of Juror #2 had that information been disclosed.  Indeed, in circumstances much more egregious

than this one, where some form of bias or prejudice was much more plausible, courts have still

remained recalcitrant to grant a new trial, finding that the stringent "challenge for cause" test had

---

[21] Defendants do not allege, nor does any of the evidence suggest, that the prosecutors in this case – Ms. Barbara E. Kittay and Mr. Daniel P. Butler – were the prosecuting attorneys in Mr. Vincent's case or were aware of any relationship between Juror #2 and Mr. Vincent.

not been met. *See, e.g.*, *United States v. Stewart*, 433 F.3d 273, 302-06 (2d Cir. 2006) (juror's failure to disclose during *voir dire* his son's conviction for attempted robbery and a civil judgment against the juror and his wife did not provide a valid basis to challenge for cause the prospective juror, as would be required to grant the defendants a new trial); *Williams-Davis*, 90 F.3d at 503 (noting that in *United States v. North*, 910 F.2d 843, 903-04 (D.C. Cir. 1990), the D.C. Circuit upheld the trial court's finding of no actual bias even though the trial court did not believe the juror's explanation of "forgetfulness" in failing to reveal that several of her brothers had been charged with crimes, one had been sent to prison, and that the juror had testified in front of a grand jury which was investigating a robbery that was allegedly committed by one of her brothers); *United States v. Boney*, 97 F. Supp. 2d 1, 5-8 (D.D.C. 2000) (trial court found that defendant failed to show actual or implied bias on the part of a juror who did not disclose his felon status during *voir dire*). Accordingly, even assuming *arguendo* that Defendants' Second Motion for a New Trial was timely, and that Juror #2 was aware of and under an obligation to reveal Mr. Vincent's criminal history, the information is insufficient to lay the foundation for a "challenge for cause" of Juror #2. As such, even assuming the truth of the facts and argument put forward by Defendants in their Second Motion for a New Trial, Defendants' motion is without merit.

### III: CONCLUSION

For the reasons set forth above, the Court shall deny Defendants' Second Motion for a New Trial. An Order accompanies this Memorandum Opinion.


Date:   April 26, 2006


                              _____/s/_____
                              COLLEEN KOLLAR-KOTELLY
                              United States District Judge